**TAGGART & TAGGART SEED, INC.; Taggart & Taggart, Inc.; Taggart & Taggart Transportation, Inc.; Tommy Taggart; Charles Taggart; and Charles Wright, Plaintiffs,**

v.

**FIRST TENNESSEE BANK NATIONAL ASSOCIATION, Defendant.**

No. H–C–87–18.

United States District Court,
E.D. Arkansas, E.D.

April 15, 1988.

David Hodges, Little Rock, Ark., for plaintiffs.

Michael C. Patton, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, Tenn., and Herbert C. Rule, III, The Rose Law Firm, Little Rock, Ark., for defendant.

## MEMORANDUM AND ORDER

HENRY WOODS, District Judge.

On April 8, 1988, the court heard oral argument on the defendant's motions to dismiss and for summary judgment. For the reasons that follow the defendant's motions are granted and the plaintiffs' complaint is dismissed.

## I. BACKGROUND

On April 24, 1984, a loan agreement was made by and between Taggart & Taggart Seed, Inc., an Arkansas corporation with its principal place of business at Augusta, Ar-

kansas, and First Tennessee Bank National Association, a nationally chartered bank with its principal place of business at Memphis, Tennessee. Pursuant to the agreement the bank agreed to provide Taggart Seed with an $18 million line of credit, with the express understanding and agreement that any advances under or extensions of the line of credit were to be made "solely at [the] [b]ank's option and discretion." Repayment of funds advanced were separately guaranteed by Taggart Seed's principal shareholders, Tommy Taggart, Charles Taggart and their respective spouses, and by Taggart & Taggart, Inc. and Taggart & Taggart Transportation, Inc., related corporations also principally owned by the Taggart brothers. The loan was secured by Taggart Seed's equipment, facilities and inventory consisting primarily of grain held in Taggart Seed's storage facilities under United States Department of Agriculture receipts.

In early May, 1984, the bank conducted a regular field examination of Taggart Seed's facilities. From this examination the bank concluded that Taggart Seed had moved 100,000 bushels of milo from its storage facilities which were loaded onto barges and shipped downriver. According to the bank, the grain which had been shipped had not yet been sold and was, at the time of shipping, still subject to warehouse receipts securing the loan. The bank considered Taggart Seed's actions an "event of default" under the loan agreement and, in late May or early June, 1984, notified Taggart Seed that it would advance no more funds under the line of credit and that it expected repayment of the outstanding balance at the earliest possible date.

It is undisputed that, despite its decision to terminate the agreement, the bank continued to advance some funds in order to let Taggart Seed complete the wheat season that was underway. In addition, the termination date of the loan agreement was extended by amendment three times between August, 1985 and January, 1986. The note was eventually repaid in full prior to April, 1986, as was required by the third amendment. At no time did the bank insti-

tute judicial proceedings against Taggart Seed or the guarantors to collect the indebtedness. Taggart Seed obtained a replacement line of credit from another lending institution in November, 1986.

On February 7, 1987, Taggart & Taggart Seed, Inc., Taggart & Taggart, Inc., Taggart & Taggart Transportation, Inc., Tommy Taggart, Charles Taggart and Charles Wright filed a complaint against the bank in an Arkansas state court alleging: (1) intentional breach of the April, 1984, loan agreement; (2) breach of the April, 1984, loan agreement; (3) negligent failure to perform or comply with the April, 1984, loan agreement; (4) "bad faith" misrepresentation; and (5) deceit. The plaintiffs claimed that they suffered severe emotional distress and economic loss as the result of the defendant bank's actions. On March 11, 1987, the defendant bank caused the action to be removed to this court under the provisions of 28 U.S.C. § 1441, jurisdiction being proper under 28 U.S.C. § 1332. On April 8, 1988, at oral argument on the summary judgment motion, the court granted leave for the plaintiffs to file an amended complaint alleging in addition to these claims set forth above: (6) "bad faith" in the context of a fiduciary relationship; (7) constructive fraud; (8) interference with contractual relations; and (9) prima facie tort.

The defendant bank has moved to dismiss or to be granted summary judgment on all claims other than those brought by Taggart & Taggart Seed, Inc., arguing that nonparties to the loan agreement have no standing to sue. The bank has also moved for summary judgment on the remaining claims arguing that it cannot be in breach for its unilateral termination of a "demand" note, that the plaintiffs executed comprehensive releases in its favor which bar this action and that the plaintiffs' tort claims were not pled with the requisite specificity under the Federal Rules of Civil Procedure.

## II. CHOICE OF LAW

Paragraph 9.06 of the April 24, 1984, loan agreement provides in part that

"this loan agreement shall be governed and construed in accordance with the laws of the State of Tennessee." The defendant bank argues that this provision should be given full effect and that this case should be decided according to Tennessee law. The plaintiffs, on the other hand, contend that because the defendant's agents traveled to Augusta, Arkansas to "call the loan," and there made alleged misrepresentations which constitute tortious conduct, the law of Arkansas should be applied.

This is a diversity action between citizens of different states and, as a federal court sitting in Arkansas, this court is required to apply the law of the State of Arkansas—including its conflicts of law rules. *Klaxon v. Stentor Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). This court concludes that an Arkansas court hearing this case would apply the law of Tennessee because all of the plaintiffs' claims, including those sounding in tort, arise from the defendant's alleged breach of the April, 1984, loan agreement. That agreement was executed by the defendant bank at its principal place of business in Memphis, Tennessee, and payments on the note were to be made there. Moreover, the parties expressly agreed that the law of Tennessee would govern the loan agreement's interpretation and, because there is a sufficient nexus with Tennessee, the parties expressed intent that the law of that state be applied should be upheld. *See Tiffany Industries, Inc. v. Commercial Grain Bin Co.*, 714 F.2d 799 (8th Cir.1983) (applying Arkansas' conflicts of law rules); *Olin Water Services v. Midland Research Laboratories*, 596 F.Supp. 412 (E.D.Ark. 1984), *appeal dismissed*, 774 F.2d 303 (8th Cir.1985) (applying Arkansas' conflicts of law rules).

## III. PARTIES PLAINTIFF

The defendant bank has moved to dismiss the claims of all parties, except Taggart & Taggart Seed, Inc., alleging lack of standing to sue because they were not parties to the April, 1984, loan agreement. The plaintiffs admit that, "[s]trictly speaking, the borrower, as defined by the bank throughout this litigation, is Taggart & Taggart Seed, Inc.," and that "[t]he other plaintiffs, Taggart & Taggart, Inc., Taggart & Taggart Transportation, Inc., Charles Taggart, Tommy Taggart, and Charles Wright were not 'borrowers' under the strict definition of the loan agreement." But they take the position, as stated in paragraph four (4) of their complaint, that the bank provided a line of credit to Taggart & Taggart Seed, Inc., "for the benefit of all the plaintiffs in this litigation." They also rely on the fact that the Taggarts and their companies guaranteed the note and they attempt to characterize Charles Wright, an employee of Taggart Seed, as a third-party beneficiary to the loan agreement. It is the opinion of the court that only Taggart & Taggart Seed, Inc. has properly stated a claim, and that the other plaintiffs should be, and are hereby dismissed.

The April, 1984, loan agreement recites that it was made by and between First Tennessee Bank National Association and Taggart & Taggart Seed, Inc. It was executed by Charles Taggart and Tommy Taggart in their capacity as officers of Taggart Seed. Taggart & Taggart Transportation, Inc. and Taggart & Taggart, Inc. are defined in the agreement as "related companies" and anyone controlling 5% or more of the capital stock of Taggart & Taggart Seed, Inc. is defined as a "related person." The agreement requires that Taggart Seed deal only at "arms length" with related persons and it prohibits Taggart Seed from making loans or investments with proceeds of the line of credit, except for the purchase of certain government securities or certificates of deposit. It is abundantly clear from these terms of the agreement that there was no intent to benefit any of the plaintiffs other than Taggart Seed.

█ Under Tennessee law, as well as the law of most other jurisdictions including Arkansas, an action to redress injuries to a corporation cannot be maintained by a shareholder in his own name, but must be brought in the name of the corporation. *Media General, Inc. v. Tanner*, 625 F.Supp. 237 (W.D.Tenn.1985); *Robertson v. White*, 633 F.Supp. 954 (W.D.Ark.1986).

The allegation of Tommy Taggart and Charles Taggart that they were damaged by the defendant's intentional, negligent bad faith or fraudulent breach of its commitment to lend money to Taggart Seed is but an attempt to piggyback their claims on top of Taggart Seed's. The injuries alleged by Tommy Taggart and Charles Taggart are incidental to and derivative of the injury alleged to the corporate entity. They state no cause of action separate and apart from that which belongs to Taggart Seed. Because the Taggart brothers are the principal shareholders of Taggart Seed, any recovery on its behalf will, of course, inure to their benefit. To allow Charles Taggart and Tommy Taggart to prosecute this action in their own names would only sanction a double recovery and violate the near universal rule that an action to redress injuries to a corporation must be brought in the corporate name.

■ Similarly, there is no theory of law upon which Taggart & Taggart Transportation, Inc. and Taggart & Taggart, Inc. can recover against First Tennessee for its alleged "tortious" breach of its lending agreement with Taggart Seed. By the terms of the agreement, Taggart Transportation and Taggart, Inc. had no interest in the loan proceeds whatsoever and they were to be dealt with by Taggart Seed only at "arms length." They were not parties to the contract and cannot state a claim for its alleged breach, intentional or otherwise. The court is mindful that the amended complaint filed April 8, 1988, includes an allegation that:

> (p)laintiffs claim damages from defendant on the trot [sic] of interference with contractual relations or tortious interference with contract, in that there was a valid contractual relationship or business expectancy between the parties and the defendant knew of the relationship or expectancy on the part of the parties and defendant intentionally interfered by in-

ducing or causing a breach or termination of the relationship or expectancy and there was resulting damage to plaintiffs.

But the court finds that this allegation too fails to state a claim.

If the phrase "valid contractual relationship or business expectancy between the parties" is read to mean the April, 1984, loan agreement, the claim must be dismissed because the defendant bank cannot be liable for tortious interference with a contract to which it is a party. *Michelson v. Exxon Research and Engineering Co.,* 808 F.2d 1005 (3rd Cir.1987); *Powell v. Feroleto Steel Co., Inc.,* 659 F.Supp. 303 (D.Conn.1986); *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago,* 754 F.2d 216 (7th Cir.1985) *cert. dismissed,* 473 U.S. 923, 106 S.Ct. 11, 87 L.Ed.2d 674 (1985). If, on the other hand, the quoted language is read to mean that the defendant's termination of the loan agreement caused one or more of the plaintiffs to breach contracts or expectancies *inter sese,* then a claim is stated only if the defendant's termination of the loan agreement was an independent wrong. *Circo v. Spanish Gardens Food Mfg. Co.,* 643 F.Supp. 51 (W.D.Mo.1985). As set forth in this opinion, *infra,* the defendant's refusal to continue funding the line of credit was not an independent wrong.[1]

Charles Wright, an employee of Taggart Seed, claims that he is a third-party beneficiary of the loan agreement between First Tennessee and Taggart Seed. This contention is completely without merit. The loan agreement evidences no intention on the part of either party to confer any benefit on Charles Wright and, in fact, makes no mention of him at all. *See Tennessee Valley Authority v. Exxon Nuclear Co., Inc.,* 753 F.2d 493 (6th Cir.1985). Charles Wright is, at best, an incidental beneficiary and, as such, has no standing to bring this action. *Willard v. Claborn,* 220 Tenn. 501, 419 S.W.2d 168 (1967).

---

1. In *Circo* the court also stated that it was arguable whether an actual breach of contract with the plaintiff could give rise to a tortious interference claim by *that plaintiff* in connection with other contracts between the plaintiffs and third persons, no matter what the defendant's motive, intent or purpose, since the ultimate effect of such a theory would be to permit a recovery of punitive damages on an otherwise ordinary breach of contract claim. 643 F.Supp. at 56, n. 6.

■ Lastly, the status of some of the plaintiffs as guarantors of the April, 1984, loan agreement does not give them standing to bring this action. There are no allegations of any attempts to recover against the guarantors. And the guarantors do not contend that they contributed toward the repayment of the note. The corporate entity, Taggart & Taggart Seed, Inc., is the real party in interest, not the guarantors who no longer have even a contingent liability on the note and who do not allege that they were ever called on for its repayment. Therefore, for the reasons above stated, the claims of all plaintiffs except Taggart & Taggart Seed, Inc. are properly dismissed.

## IV. THE DEMAND CLAUSE

■ The April 24, 1984, loan agreement between First Tennessee and Taggart Seed can be construed only as a demand note. Section 2.01 of the loan agreement states that First Tennessee "shall not have any obligation to borrower to make any requested loan advance or extension of credit," and section 9.13, captioned "demand," provides that:

> Nothing contained herein, in the Security Agreements, or in any other loan document shall be construed to prevent Bank from making demand for payment of the Loan and all other extensions of credit at any time that Bank, in the exercise of its sole discretion, deems necessary or desirable; and, in the event of any such demand, (a) Bank shall have no further obligation to make loan advances or to extend credit, and (b) the entire unpaid principal balance of the Loan and other extensions of credit, and all accrued interest, shall become due and payable for all purposes immediately upon the making of such demand.[2]

The defendant bank makes the argument that under the terms of the note set forth above its decision to discontinue funding of the line of credit and its demand for repayment of the outstanding balance cannot be regarded as a breach of the loan agreement, tortious or otherwise.[3] The plaintiffs maintain, on the other hand, that they are entitled to damages for the bank's refusal to continue funding the line of credit because that decision was made in "bad faith."

The plaintiffs' argument is based on provisions of the Uniform Commercial Code under which a "good faith" term is implied in every contract. U.C.C. § 1–203 provides that "every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement," good faith meaning "honesty in fact" in the conduct or transaction concerned. *See* T.C.A. § 47–1–203. And a more specific application of the good faith requirement is found in U.C.C. § 1–203 which states that a term providing that one party may accelerate payment at will or when he deems himself insecure "shall be construed to mean that he shall have the power to do so only if he in good faith believes that the prospect of payment or performance is impaired." *See* T.C.A. § 47–1–208.

However, the defendant bank maintains that the U.C.C. good faith requirement is not applicable to a demand note and, therefore, the question of good faith is immaterial to the resolution of this case. The court agrees and finds that allegations of bad faith do not create a genuine issue of material fact to preclude summary judgment. The Official Comment to U.C.C. § 1–208 states that "obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason, [but rather], this section applies only to an agree-

---

2. This language also appears in the first, second and third amendments to the loan agreement.

3. The court also notes the language of paragraph 8.09 of the loan agreement which states that:

> *Remedy.* Upon the occurence of any Event of Default, as specified herein, *or upon Bank's demand for payment of the note, the Bank*

> *shall, at its option, be relieved of any obligation to make further extensions of credit* under this Agreement; and the Bank may, at its option, thereupon declare the entire loan indebtedness and all other extensions of credit to be immediately due and payable for all purposes.... (emphasis added).

ment or to paper which in the first instance is payable at a future date." And courts have held that the lack of good faith defense is unavailable in a suit to collect on a demand note, which by its very nature can become due and payable at any time after its execution *See Flagship National Bank v. Gray Distribution Systems, In.*, 485 So.2d 1336 (Fla.App.1986), *review denied*, 497 So.2d 1217 (Fla.1986); *Fulton National Bank v. Willis Denney Ford, Inc.*, 154 Ga.App. 846, 269 S.E.2d 916 (1980); *Centerre Bank of Kansas City, N.A. v. Distributors, Inc.*, 705 S.W.2d 42 (Mo.App.1985); *Allied Sheet Metal Fabricators, Inc. v. Peoples National Bank*, 10 Wash.App. 530, 518 P.2d 734 (1974); *but see K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985) (applying New York law) (criticized at 104 Banking L.J. 492 (Nov.–Dec. 1987)).

Moreover, the defendant cites the court to a recent decision by the Tennessee Court of Appeals which is indicative of the way Tennessee courts would decide the issue presented here. *In Bank of Crockett v. Cullipher*, 1988 WL 3987, No. 1, 4829 R.D., slip op. (Tenn.App., January 21, 1988), the obligor on promissory notes held by a Tennessee bank sought to be relieved of his obligation to pay when the bank released a co-obligor from the note without his consent. The obligor alleged, *inter alia*, bad faith and breach of the duty of reasonable care on the part of the bank. The court rejected these defenses and held that, under Tennessee's version of the Uniform Commercial Code, the bank did not breach any duty to the obligor. In reaching this conclusion the court relied on the fact that the express terms of the notes specifically allowed the bank to release any party to the note without affecting the others' obligation to pay. And the court reasoned that, although the parties may not totally disclaim the obligation of good faith, they may by agreement determine the standards by which the performance of obligations are to be measured.

In the instant case paragraphs 2.01, 8.09 and 9.13 of the loan agreement determine the standard by which the defendant bank must be judged. Those paragraphs state unambiguously that at any time the bank deems necessary or desirable, in its sole discretion, it may demand payment and, upon such demand, the note becomes immediately due and payable and, at its option, the bank shall be relieved of any obligation to make further advances. In addition, the agreement made clear that the bank was under no obligation to make "any requested loan advance or extension of credit." In the face of such an agreement the court is of the opinion that there is no lack of good faith defense available, much less an action in tort for bad faith. The bank was entitled to terminate the loan for any reason or for no reason and it cannot be held liable to the plaintiffs for refusing to extend credit when it had no obligation to do so. *Todd v. Third National Bank*, 172 Tenn. 586, 113 S.W.2d 740 (1938).

The plaintiffs in this case are in no position to argue ignorance of the true nature of the contract. They are sophisticated businessmen and were assisted in the loan negotiations by an attorney and an accountant. In the court's view it is very likely that, were it not for the demand feature, the loan may never have been made in the first instance. And given the materiality of the demand provision, the court will not undertake to eviscerate the contract without clear and convincing evidence of fraud. There is no such evidence here. *See* discussion, *infra*, under heading V.

Accordingly, the court finds that the plaintiffs' claims of (1) intentional breach of contract, (2) negligent breach of contract, (3) breach of contract, (4) intentional tort, (5) bad faith in the context of fiduciary relationship, and (6) bad faith breach of contract should be dismissed.

## V. SUFFICIENCY OF THE COMPLAINT

■ In its answer, and again in its motion for summary judgment, the defendant raises objections to the sufficiency of the complaint under Federal Rule of Civil Procedure 9(b), which requires that averments of fraud be stated with particularity. The relevant portions of the plaintiffs' amended

complaint, filed on the morning of the summary judgment hearing, are as follows:

Plaintiffs contend the agents, servants and employees of the defendant committed the tort of deceit in that the agents, servants and employees made false representations of fact with knowledge or belief on the part of the agents, servants and employees that the representations were false or that they did not have a sufficient basis of information to make the representations....

....

Plaintiffs contend the defendant, by and through the agents, servants and employees of the defendant, made representations of an existing fact, said representations being false, the representation was with regard to a material fact and it was relied upon by the plaintiffs and they suffered damage as a result of the representations.

....

It is anticipated that the plaintiffs will file an Amendment to this Complaint more specifically describing the facts and circumstances giving rise to the causes of action complained of herein and more particularly describing the damages suffered by the plaintiffs as a result of actions on the part of the defendant.

....

Plaintiffs ask for judgment against the defendant based upon the cause of action of constructive fraud which consists of a breach of a duty from the defendant to the plaintiffs. Defendant sought to gain an advantage over the plaintiffs by misleading them to the prejudice of the plaintiffs and their conduct, including fraudulent conduct, has the consequences and legal effects of active fraud as it relates to these plaintiffs. Plaintiffs contend the constructive fraud of the defendant consists of the acts, omissions and concealments involving a breach of a legal or equitable duty owed by the defendant to the plaintiffs, trust or confidence which resulted in damage to the plaintiffs.

These allegations are nothing more than a regurgitation of the elements of the torts of deceit, misrepresentation and constructive fraud. Nowhere in the complaint are any allegations of the time, place, manner or content of the alleged misrepresentations. Nor is there even an allegation which attributes the alleged fraudulent conduct to a specific servant or agent of the defendant. *See Greenwood v. Dittmer*, 776 F.2d 785, 787 (8th Cir.1985) (conclusory allegations of misrepresentation held insufficient under Rule 9(b)). Paragraph 21 of the amended complaint states that the plaintiffs will file an amendment specifically describing the facts and circumstances giving rise to the causes of action, but the court is at a loss as to when the plaintiffs propose to so amend—the complaint at issue was filed on the morning of the summary judgment hearing which, in turn, was held only two days before the scheduled trial.

The import of paragraph 21 of the amended complaint is that the plaintiffs were aware of the deficiency in their pleading. And, in addition, the court finds that the defendant's answer and motion for summary judgment put the plaintiffs on notice that their complaint fell "far short" of the requirements of Rule 9(b). Yet, even though discovery had been completed, and leave to amend had been granted on the eve of trial, the amended complaint still failed to plead any facts or circumstances giving rise to the fraud, deceit and misrepresentation claims.[4] Accordingly, the court finds that the plaintiffs' allegations of fraud, deceit and misrepresentation fail to state a claim upon which relief may be granted and that same should be, and are hereby dismissed.

---

**4.** Tommy Taggart testified in his deposition that he could not think of any instances in which representatives of First Tennessee lied to him. And Charles Taggart similarly testified that prior to the loan closing date no one from First Tennessee had made any untrue statements to him. This testimony, together with the omission from the amended complaint of any specific facts, leads the court to believe that there is no basis for the claims of fraud, deceit and misrepresentation.

## VI. THE RELEASE CLAUSE

■ The Third Amendment to and extension of the April 24, 1984, loan agreement contains a release clause which provides in part that:

> Upon full payment and satisfaction of the loan and the interest thereon, as provided in Paragraph 3 hereof, the parties shall thereupon automatically each be fully, finally, and forever released and discharged from any further claim, liability or obligation in connection with the loan....[5]

The defendant bank contends that, because the loan was fully paid in accord with the terms of the third amendment, the plaintiffs' claims are all barred by the release. The plaintiffs deny that the release is valid or binding and, in the alternative, argue that it should be construed much more narrowly than the defendant advocates.

The *Restatement, Second, of Contracts*, § 284, defines a release as a writing providing that a duty owed to the maker of the release is discharged immediately or on the occurrence of a condition. The official comment to that section states that the rules of interpretation that apply to contracts generally apply also to writings that purport to be releases, and that the principal purpose of the obligee is to be given great weight if it can be ascertained. *See Restatement, Second, Contracts* § 284, Official Comment "C." Under Tennessee law, a clear and unambiguous contract must be interpreted as written. And the intent of the parties as expressed in the terms of the agreement determines the scope and extent of a release. *Hill v. A.O. Smith Corp.*, 801 F.2d 217, 221 (6th Cir. 1986) (applying Tennessee law) (citing *Sutton v. First National Bank*, 620 S.W.2d 526, 530 (Tenn.App.1981)).

In *Hill*, the buyers of agricultural feed storage structures had experienced foundation problems with the structures which the dealer was unable to correct. In return for the seller's agreement to provide replacement structures, the buyers signed a release "expressly discharging and releasing" the seller, manufacturer, designer and holder of the finance agreement from "any and all claims ... of any nature whatsoever, known or unknown" connected with the structures. Subsequently, when the buyers became delinquent in their scheduled payments, they entered into nine extension agreements with the noteholder in consideration for which they signed separate releases waiving "all claims arising out of the purchase of said property."

Notwithstanding the releases which had been executed, the buyers filed an action against the designer, manufacturer and holder of the note alleging that defects unrelated to the earlier foundation problems caused feed spoilage resulting in damage to their dairy herd. The Sixth Circuit panel determined that the release given in exchange for replacement structures was void, but that the releases given in exchange for the extensions were valid and binding. The earlier release, the court reasoned, was based upon a mutual mistake of fact because the defect which caused feed spoilage was not contemplated by the parties and did not concern the earlier foundation problem.[6] However, there were no such circumstances surrounding the negotiations for the latter releases which could lead to the conclusion that they were not intended to cover "all claims."

In the instant case the plaintiffs have admitted execution of the release and the court will presume that they read and understood the agreement they signed. *Dixon v. Manier, supra,* note 6. The third amendment recites that "the borrower has requested an extension of the termination date" of the April, 1984, loan agreement and that the bank agreed to the extension subject to the conditions stated therein.

---

5. In addition, the borrower warranted in the First, Second and Third Amendments to the loan agreement that it had no defenses, offsets *or counterclaims* to any obligations under the note. (emphasis added).

6. Although the court did reject the buyer's argument that the first release was procured by fraud because, under Tennessee law, the buyers were presumed to have read and understood the agreement they had signed. 801 F.2d at 222 (*citing Dixon v. Manier*, 545 S.W.2d 948, 949 (Tenn.App.1976)).

Both Tommy Taggart and Charles Taggart testified at depositions that there were no other negotiations concerning the extension. Therefore, the effect of the release, which was made a condition of the extension, must be determined by the intent of the parties as expressed in the writing, and not by reference to extrinsic matters. *Hill v. A.O. Smith Corp., supra.*

The court finds the language of the release clause to be clear and unequivocal—there is no ambiguity as the plaintiffs argue. The provision that upon full payment and satisfaction the parties be "fully, finally and forever released and discharged from any further claim, liability or obligation in connection with the loan" plainly expresses an intent to effect a mutual release of all claims in connection with the loan which either party may have had against the other. Moreover, either because the release was given in exchange for an extension of the loan, or because it is a mutual release, by definition, no further consideration was required.

Accordingly, the court concludes that there are no genuine issues of material fact in dispute, that the release agreement at issue is valid and binding, that it operates as a bar to the plaintiffs' action, and that further judicial examination of the matter is precluded by Tennessee law. *Milwee v. Peachtree Cypress Investment Co.,* 510 F.Supp. 279 (E.D.Tenn.1977).[7]

## VII. CONCLUSION

The claims of all plaintiffs, except Taggart & Taggart Seed, Inc., are dismissed for lack of standing, summary judgment is granted in favor of the defendant on all of the plaintiffs' tort and contract claims for

---

7. Although the release refers only to the borrower, Taggart & Taggart Seed, Inc., the court finds that it also bars the claims of the other plaintiffs inasmuch as they are derivative of Taggart Seed's claims as discussed under III, *supra.* In addition, the guarantors executed the Third Amendment to the April 24, 1984, loan agreement, Paragraph 8 of which states:

> The Guarantors join in the execution of this Amendment for the purpose of consenting and approving to [sic] all of the terms and provisions set forth herein, insofar as their rights are or may be affected hereby.

failure to state a claim upon which relief may be granted and, in the alternative, the court finds all of the plaintiffs' claims barred by the release. Therefore, the plaintiffs' complaint should be, and is hereby dismissed with prejudice.

. . . .

/s/ Thomas R. Taggart,
Rosemary Taggart,
Charles T. Taggart,
Kitty Taggart,
Taggart & Taggart,
Inc. by
Charles Taggart,
Taggart & Taggart
Transportation, Inc.
by Tommy Taggart.