FIRST COMMERCIAL BANK, N.A. *v.* Michael W. WALKER, Aearth Development, Inc., Aearth Preparation, Inc., and Coal Processors, A Joint Venture

96-1495 969 S.W.2d 146

Supreme Court of Arkansas
Opinion delivered April 30, 1998

*Barber, McCaskill, Jones & Hale, P.A.*, by: *Glenn W. Jones, John S. Cherry*, and *Joseph F. Kolb*; and *Williams & Anderson*, by: *Philip S. Anderson, Leon Holmes*, and *Katharine R. Cloud*, for appellant/cross-appellee.

*The Burk Law Firm, A Professional Corporation*, by: *Michael G. Burk*; *Walker & Black*, by: *Kendell R. Black*; and *James E. Burk*, for appellees/cross-appellants.

RAY THORNTON, Justice. Plaintiffs, Michael W. Walker, Aearth Development, Inc. (Aearth), Aearth Preparation, Inc., and Coal Processors, brought the underlying lender-liability action, asserting that wrongful actions of defendant, First Commercial Bank and its predecessors (the Bank), caused the failure of plaintiffs' coal mining, processing, and sales business in the Arkansas River Valley. This is the second appeal involving the disposition

of these issues. The first appeal followed the chancery court's judgment in favor of the Bank on all allegations after a twelve-day trial. On appeal, the jurisdiction of the chancery court was challenged, and we determined that the lower court erred in transferring the case from circuit court to the chancery court because the chancery court lacked subject-matter jurisdiction. *See Walker v. First Commercial Bank*, 317 Ark. 617, 880 S.W.2d 316 (1994) (*Walker I*). We reversed and remanded with instructions to transfer the case to circuit court, without binding the circuit court on any issue decided by the chancellor.

Individual plaintiff Michael Walker was a principal stockholder in Aearth, which formed a wholly owned subsidiary, Aearth Preparation, Inc. Aearth entered into a joint venture with other parties to form Coal Processors. We refer jointly to Aearth Development, Inc., Aearth Preparation, Inc., and Coal Processors as "the Aearth business entities." Aearth held a 75% interest in Coal Processors, and the remaining 25% was acquired by George Locke, who is not a party to this proceeding. In addition to being a stockholder and officer of Aearth, Mr. Walker was a guarantor of notes executed by the Aearth business entities to obtain funds from the Bank and other sources of credit.

At trial in the circuit court, the Bank challenged the standing and capacity of plaintiffs as a threshold matter, and also urged the court to declare that all of plaintiffs' claims were barred on principles of judicial estoppel because those claims were not asserted during prior bankruptcy proceedings. Over the Bank's objections, issues of fraud, conversion, and tortious interference with contractual relations were presented to the jury, which returned a $22.5 million verdict. The court reduced this verdict by a set-off that the court determined to be greater than $7.3 million, which, together with a remittitur of $7 million from the award of punitive damages, resulted in a verdict of $8.2 million.

From this order, the Bank appeals and plaintiffs cross-appeal, together asserting seventeen claims of error. We have determined that the Aearth business entities did not have the capacity to bring the action for "lender liability" and that Mr. Walker did not have standing to pursue, either as a stockholder or guarantor, the same

causes of action asserted by the Aearth business entities. Accordingly, we reverse and dismiss.

## Factual Background

Mr. Walker formed Aearth Development, Inc., in 1978. Aearth entered into a joint venture with Russell Mining Company of Kansas. At the time of this joint venture, Mr. Walker owned 40% of Aearth, and the balance of the stock was held by three other persons. Some coal was produced and sold, primarily to charcoal markets. In early 1980, Russell Mining withdrew from the joint venture. At that time, Aearth owned a small bulldozer, a front-end loader, and a scraper, and depended on contractors to provide their own equipment. Aearth had not yet made a profit from its operations. An overseas purchaser expressed an interest in Arkansas coal, but the coal had a high sulfur content with sulfur in the form of pyretic sulfur or "fools gold," which often prevented the raw product from meeting the requisite specifications.

Aearth sought development capital to enhance the quality of its product in order to compete in the market place. In December 1980, Mr. Walker engaged the investment firm of Collins, Locke, and Lasater to assist in obtaining a target of $10,000,000 in development financing. One of the principals of the firm, George Locke, became personally interested in the enterprise. On December 16, 1980, Mr. Locke persuaded the Bank to grant Aearth, which had virtually no working capital, a line of credit of $500,000, secured by the personal guarantees of Mr. Locke and Mr. Walker. By April 27, 1981, the full amount of the note had been advanced, and no repayments had been made on that note. Aearth's inventory and accounts receivable had been pledged as collateral to the Bank, and this security agreement was never terminated.

On May 20, 1981, Aearth, Mr. Locke, and Mr. Walker acquired a second line of credit from the Bank in the amount of $800,000. No repayments were made on this loan.

In June 1981, Aearth entered into a joint venture with Arkala Coal Company. This joint venture, Coal Processors, named Mr.

Locke as managing agent. With Mr. Locke's assistance, the joint venture obtained two lines of credit from the Bank, aggregating an additional sum of $1,475,000 to be used in constructing a coal-washing facility. The notes for these lines of credit were signed by Aearth, Mr. Locke, and Mr. Walker, as well as by the principals of Arkala. These notes were fully advanced and were replaced by a single note, executed on November 30, 1981, by Coal Processors, Mr. Locke, and Mr. Walker, among others.

Notwithstanding promises made in several loan agreements with the Bank to refrain from entering into other loan agreements and encumbering assets and collateral already pledged to the Bank, Aearth, together with Mr. Locke and Mr. Walker, entered into two separate agreements with other creditors using some of the same assets as security. Aearth executed a note on December 23, 1981, in the amount of $716,000 to Bono, DiGiglia, and Levingston of Louisiana; however, only about $500,000 of this note was actually advanced. On January 9, 1982, Aearth also executed a security agreement pledging its assets to Taylor Machinery of Memphis as security for $662,667.36 that Taylor Machinery advanced to Aearth.

Additionally, on December 10, 1981, the Bank advanced to Coal Processors an additional $150,000. The note for this advance was due on March 10, 1982. Aearth executed another note to the Bank on April 9, 1982, for a $300,000 loan, which was due on May 10, 1982. By April, the Aearth business entities were in default on all loans except this note that was due on May 10, 1982, and the entities owed the Bank $2,925,000, plus interest.

On April 15, 1982, Aearth borrowed $272,000 from Dan Lasater, who personally borrowed this amount from the Bank, for the purpose of paying two past due installments on Coal Processors' $1,475,000 note to the Bank. Mr. Lasater's demand note to the Bank was due on or before May 14, and the Bank agreed to subordinate its right to any funds received from Aearth to Mr. Lasater. Aearth committed to Mr. Lasater that this debt would be paid from the first proceeds of a specified sale of coal, and Aearth instructed the broker for the purchaser of the coal that $272,000 of the proceeds were payable to Mr. Lasater.

While the Aearth business entities had also pledged proceeds from the sale of this coal to Taylor Machinery and other creditors, the specific instructions given by Aearth to the broker did not provide for any distribution of these funds to Taylor Machinery. When the $245,823.96 proceeds from the first sale were deposited in an escrow account at the Bank, the Bank applied these proceeds to Mr. Lasater's loan.

Taylor Machinery had become concerned about the repayment of its $662,667.36 advance, and on or about April 6, Taylor Machinery had drawn down a $300,000 line of credit from the Bank, reducing its exposure to about $360,000. Aearth had orally represented that some of the proceeds from the first sale of coal would be applied to Taylor Machinery's claims, and when these funds were not forthcoming, Taylor Machinery orally told Aearth to park the equipment pending some resolution of the financial problems. After several weeks, Taylor Machinery arranged to have its equipment picked up and returned to Memphis.

The Aearth business entities discontinued operations and filed Chapter 11 bankruptcy proceedings in November 1982. In December 1983, the bankruptcy court converted the Chapter 11 proceedings to a Chapter 7 liquidation. In May 1984, Mr. Walker filed a personal Chapter 7 bankruptcy petition.

### Standing and Capacity of the Parties

We first consider whether, under principles of Arkansas law, plaintiffs had standing or capacity to bring an action for lender liability against the Bank. Plaintiffs argue that these issues are not preserved for our review. We disagree. The issue of standing and capacity was preserved by a timely motion for a directed verdict that was renewed at the conclusion of the case.

Plaintiffs argue further that the issues were resolved in *Walker I*, and that by determining that the chancery court did not have subject-matter jurisdiction, we decided these issues *sub silentio* and that plaintiffs have standing and capacity as a result of the law of the case and res judicata. This argument also lacks merit.

■ ■ The doctrine of law of the case does prevent an issue raised and decided in the first appeal from being raised in a subsequent appeal. *Bennett v. State*, 308 Ark. 393, 825 S.W.2d 560 (1992). However, our decision in *Walker I* was predicated solely on the issue whether the chancery court had subject-matter jurisdiction. We stated expressly that we "need not address any other issues in view of the ruling on this dispositive issue." *Walker v. First Commercial Bank*, 317 Ark. at 619, 880 S.W.2d at 317. Our determination that the chancery court was without jurisdiction afforded the trial court a clean slate on which to consider the entire case, including motions to dismiss for lack of standing, motions for summary judgment, and all other matters, as though the chancery court had not acted at all. Therefore, our review of standing and capacity is not barred by the law of the case.

■ ■ The doctrine of res judicata likewise does not bar the circuit court's or our consideration of standing and capacity. For res judicata to apply, the claim must have been adjudicated on the merits; this requirement presupposes that the court in which the claim was litigated properly had jurisdiction over those proceedings. *Crockett & Brown, P.A. v. Wilson*, 314 Ark. 578, 864 S.W.2d 244 (1993). Here, the chancery court rendered a judgment for the Bank on the merits, but we reversed that decision for lack of subject-matter jurisdiction. Therefore, the circuit court was not required by the doctrine of res judicata to adopt on remand any of the Chancellor's holdings.

The gravamen of plaintiffs' complaint is that the Bank's wrongful actions damaged the Aearth business entities, breached an alleged agreement to provide long-term financing to the Aearth business entities, impaired their ability to obtain other financing, interfered with their contracts with others, and wrongfully applied funds belonging to the business entities to a debt owed by the business entities. For the reasons stated below, we have determined that Mr. Walker, as an individual, lacked standing to bring this action against the Bank for compensatory and punitive damages that the Aearth business entities allegedly suffered.

*A. Standing of Michael W. Walker as individual stockholder and guarantor or comaker of business debts of the corporate plaintiffs*

■ Looking at the three underlying tort claims, each of plaintiffs' claims was based on allegations of the Bank's wrongful conduct against the *Aearth business entities*. Plaintiffs claimed that the Bank tortiously interfered with its contractual relations regarding the performance of contracts to sell coal and the performance of various other contractual commitments. All of these allegations were based on the Bank's actions with respect to the Aearth business entities' performance of their contracts with third parties. To prevail on a claim for interference with a contractual relation, a plaintiff must present evidence and prove that a third party failed to continue a contractual relationship *with the claimant* as a result of the defendant's improper conduct. *Navorro-Monzo v. Hughes*, 297 Ark. 444, 763 S.W.2d 635 (1989). Plaintiffs did not allege that the Bank's actions caused a third party to fail to continue a contractual relationship with Mr. Walker, but rather asserted that the Bank's conduct caused a third party to discontinue a contractual relationship with the Aearth business entities.

■ In plaintiffs' fraud claim, they alleged that the Bank fraudulently induced them to enter into the November 31, 1981, loan agreement by promising to provide long-term financing for all the debts of the Aearth business entities. Similarly, only the Aearth business entities could assert this tort claim. There was no allegation that the Bank had made or breached any promise to provide financing to Mr. Walker as an individual; rather, the claim was that there was a breach of a promise to enter into long-term financing with the Aearth business entities. The Aearth business entities' loans were guaranteed by Mr. Walker, Mr. Locke, and others; however, the Aearth business entities were the primary obligors of the loans and the holders of legal title to the assets pledged for the repayment of the loans.

■ The third claim that went to the jury was that the Bank allegedly converted $245,000 belonging to the Aearth business entities that had been deposited in an Aearth escrow account. Plaintiffs asserted that the premature crediting of these proceeds from the specified sale of coal to reduce Mr. Lasater's debt to the

Bank caused Taylor Machinery to withdraw its equipment, resulting in Aearth's downfall. There is no allegation that Mr. Walker asserted any right or interest in these funds for his own individual benefit; therefore, the Aearth business entities were again the only parties who could assert, as owners, that the Bank's actions constituted a conversion of the escrow account.

██ ██ There is a near universal rule that a corporation and its stockholders are separate and distinct entities, even though a stockholder may own the majority of the stock. *Banks v. Jones,* 239 Ark. 396, 390 S.W.2d 108 (1965). A corporation has the power to sue and be sued in its corporate name. Ark. Code Ann. § 4-26-204(a)(2) (Repl. 1991). The court of appeals has stated that a corporation is "a legal entity which, being distinct from its members, owns the corporate property and owes the corporate debts, is the creditor to sue or the debtor to be sued, has perpetual existence, and can act only through its duly constituted organs, primarily its board of directors." *Arkansas Iron & Metal Co. v. First Nat'l Bank of Rogers,* 16 Ark. App. 245, 251, 701 S.W.2d 380, 383 (1985).

██ Generally, the officers and members of a corporation may not sue or be sued in their own name. *See* 19 C.J.S. *Corporations* § 711, at 364 (1990). A corporate officer has no individual right of action against a third party for alleged wrongs inflicted on the corporation, even if the officer is the sole shareholder. *Id.* § 629, at 277.

A recent federal case provides some guidance on a similar question. *See Taggart & Taggart Seed v. First Tenn. Bank Nat'l Ass'n,* 684 F. Supp. 230 (E.D. Ark. 1988). In *Taggart,* the defendant bank had provided plaintiffs with an $18 million line of credit and repayment of the funds advanced were guaranteed by the corporations' principal shareholders Tommy Taggart, Charles Taggart, and their spouses, as well as other guarantors. The loan was further secured by the pledge of the corporation's equipment, facilities, and inventory. The bank considered that an act of default had occurred and terminated the agreement. The note was repaid in full, and plaintiffs secured another line of credit. The corporation and the individual stockholders and guarantors filed a lender-lia-

bility action, with allegations including bad faith, misrepresentation, deceit, constructive fraud, interference with contractual relations, and economic loss. *Id.*

The court granted the bank's motion to dismiss all parties except the corporation. *Id.* The district court stated that the claims of the individual guarantors that they suffered damages because of the bank's breach of its promise to lend further money to the corporation was "an attempt to piggyback their claims on top of Taggart Seed's." *Id.* at 234. The court noted that the injuries that the individuals alleged were "incidental to and derivative of the injury alleged to the corporate entity . . . . To allow [the individuals] to prosecute this action in their own names would . . . violate the near universal rule that an action to redress injuries to a corporation must be brought in the corporate name." *Id.*

In concluding that the claims of the individual plaintiffs were properly dismissed, the district court stated:

> [T]he status of some of the plaintiffs as guarantors of the April, 1984, loan agreement does not give them standing to bring this action . . . . [T]he guarantors do not contend that they contributed toward the repayment of the note. The corporate entity, Taggart & Taggart Seed, Inc., is the real party in interest, not the guarantors who no longer have even a contingent liability on the note and who do not allege that they were ever called on for its repayment.

*Id.* at 235.

As in *Taggart*, there is no showing in the case before us that Mr. Walker has made any contribution toward payment of the notes that he guaranteed, even though it appears that Mr. Walker has been discharged from bankruptcy. Also, as stated above, the wrongs that plaintiffs sought to redress were corporate injuries, not injuries to Mr. Walker as an individual.

We recognize that Mr. Walker also asserted that because he was a guarantor of the various loans, he should have standing as a "party" to the loan agreements. However, the undertaking of the principal debtor, here the Aearth business entities, is independent of the promise of the guarantor, Mr. Walker. *First American Nat'l Bank v. Coffey-Clifton, Inc.*, 276 Ark. 250, 633

S.W.2d 704 (1982). A guarantor is one who makes a contract, which is distinct from the principal obligation, to be collaterally liable to the creditor if the principal debtor fails to perform. *Id.* (citing 10 Samuel Williston and Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 1211, at 685-86 (3d ed. 1967)); *see also First Nat'l Bank of Helena v. Solomon*, 170 Ark. 555, 280 S.W. 659 (1926). There is no holding in any of these cases that a guaranty relationship merges with that of a principal borrower so as to allow the guarantor to pursue the borrower's causes of action.

In *Schmidt v. McIlroy Bank & Trust*, 306 Ark. 28, 811 S.W.2d 281 (1991), the appellants made a similar argument that they, as guarantors, should have standing to pursue lender-liability claims on behalf of the corporate entity. In concluding that the individual appellants had no standing to sue for injuries to the corporation, we observed:

> [Appellants'] argument is that when the corporation's charter was revoked for failure to pay franchise fees, the officers and shareholders were considered to be operating the business as a partnership and were individually liable for the obligations of the *de facto* corporation, and since they were subjected to individual liability as partners, they ought to be allowed, in fairness, to bring suit in the same capacity. The argument, while novel, is without merit . . . . The effect of revocation was that the corporation lost its capacity to sue, and this particular type of corporate cause ceased to exist. To allow the individual appellants to bring this cause of action would effectively reverse prior law which prohibits suits by a corporation whose charter has been revoked . . . .

*Id.* at 33, 811 S.W.2d at 283-84 (citations omitted).

Mr. Walker's status as a majority shareholder does not vest him with standing to pursue causes of action that belong to the corporate borrowers. Likewise, in borrowing the funds, Mr. Walker acted as a representative of the Aearth business entities and as a guarantor of the debt. Although he was shown as a "maker" on some of the loan documents, he does not have standing to maintain this action because the Aearth business entities were the principal borrowers and sole recipients of the borrowed funds. Mr. Walker acted only as a guarantor, even on those notes that he

signed individually and as a representative of Aearth business entities.

We conclude that Mr. Walker did not have standing to bring this action either as an individual stockholder and officer of the Aearth business entities or as a guarantor of the debts of the Aearth business entities.

## B. Capacity of the Aearth Business Entities

On November 27, 1984, before the original complaint was filed in this matter, the corporate charters of Aearth Development, Inc., and Aearth Preparation, Inc., were revoked for nonpayment of franchise taxes. The other business plaintiff, Coal Processors, was a joint venture with Aearth Development, Inc., and George Locke as the joint venturers at the time the Aearth business entities filed voluntary bankruptcy petitions on November 4, 1982. Under the terms of the agreement creating the joint venture, the joint venture dissolved and was terminated upon the bankruptcy, insolvency, or involuntary dissolution of either joint venturer. As provided in 11 U.S.C. § 301 (1994), the commencement of a voluntary bankruptcy constitutes an adjudication of bankruptcy, and additionally the revocation of the corporate charter resulted in the dissolution of the corporate entities.

In considering whether a corporation that had ceased to exist could initiate a lawsuit, we have stated:

> [T]he trial judge ruled, quite properly, that a corporation not in existence could not initiate a lawsuit. This is the law. In *Sulphur Springs Recreational Park, Inc. v. City of Camden*, 247 Ark. 713, 447 S.W.2d 844 (1969), we affirmed a trial court's dismissal of a complaint, because the plaintiff's corporate charter was not in existence when the suit was filed . . . . A suit must be initiated by a person, natural or artificial. *Fausett & Co. v. Bogard*, 285 Ark. 124, 685 S.W.2d 153 (1985).

*Committee for Utility Trimming Inc. v. Hamilton*, 290 Ark. 283, 284-85, 718 S.W.2d 933, 934 (1986). We determined that the corporation's complaint was properly dismissed because our law provides that a corporation cannot file a complaint in court after it ceases to exist legally. *Id.*

██ From these cases, we conclude that all of the Aearth business entities lost the capacity to file suit following the dissolution of the joint venture, Coal Processors, and the revocations of the corporate charters of Aearth Development, Inc., and Aearth Preparation, Inc., on November 27, 1984.

### Other Issues and Conclusion

The Bank advanced a separate argument that the doctrine of judicial estoppel bars plaintiffs' claims in this case. Plaintiffs declared to the bankruptcy court that they had no lender-liability claim against the Bank, or that such a claim had a zero value. This representation was made under penalty of perjury, and if plaintiffs in this case had standing and capacity to bring their cause of action against the Bank, we would carefully consider whether the circumstances of this case call for us to apply the doctrine of judicial estoppel.

However, having determined that Mr. Walker did not have standing to bring this action and that the Aearth business entities had lost their capacity to bring suit, we need not determine whether the principles of judicial estoppel would bar these claims or address the remaining issues presented to us for decision.

We reverse and dismiss.

GLAZE, BROWN, and IMBER, JJ., not participating.

Special Justices J.W. GREENE, JR., and MARK KLAPPENBACH join in this opinion.

Special Justice HANI W. HASHEM concurs.

HANI W. HASHEM, Special Justice, concurring. I agree with the majority decision reversing and dismissing this case. However, I write briefly to distinguish this case from *Calandro v. Parkerson*, 327 Ark. 131, 936 S.W.2d 755 (1997). I am concerned that, without delineation, our decision here may leave some misconception of inconsistency of decisions of this Court. In *Calandro*, a defunct corporation and its shareholders sued their attorney alleg-

ing malpractice, breach of contract, and deceit. The trial court granted summary judgment to the attorney on all three causes of action, finding that the revocation of the corporation's charter caused it to lose its ability to bring suit. The trial court further found that the individual shareholders lacked standing and were not proper parties. On appeal, this Court found the summary judgment proper as it related to the corporate causes of action for breach of contract and attorney malpractice. However, the claim of the individual shareholders for deceit was reversed and remanded to the trial court. I see the distinction as being the procedural stages of the appeals involved between *Calandro* and this case.

In *Calandro*, the individual shareholders asserted that the attorney had knowingly made false representations, upon which they had relied to their detriment. This Court simply ruled that there was a sufficient question of fact regarding the allegations of false representation in reversing the trial court's decision on the deceit claim. *Calandro*, 327 Ark. at 138, 936 S.W.2d at 759. After careful consideration and stringent scouring of the behemoth record in this appeal, I can find no credible, factual basis to believe that Michael W. Walker bore the brunt of any misrepresentation which caused him harm separate and apart from the Aearth corporate entities. "You've got to guard against speaking more clearly than you think." *Washington Post*, June 24, 1973, quoting Howard H. Baker, Jr., U.S. Senator.