### In re CHEQNET SYSTEMS, INC.

Larry Terry And Cheques, Inc., Plaintiffs,

v.

M. Randy Rice, Trustee, Defendant.

M. Randy Rice, Trustee, Counterclaimant,

v.

Larry Terry And Cheques, Inc., Counterclaim Defendants.

Bankruptcy No. 97–40464 S. Adversary No. 97–4149.

United States Bankruptcy Court, E.D. Arkansas, Little Rock Division.

Jan. 25, 2000.

J.B. Cross, Little Rock, AR, for Plaintiff or Petitioner.

M. Randy Rice, Little Rock, AR, for Defendant or Respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARY D. SCOTT, Bankruptcy Judge.

## I. FACTUAL BACKGROUND

Larry Terry owned and operated a collection agency, Cheques, Inc.[1] At some time in the mid–1980's, he combined his agency with another agency, Recovery Systems, owned by Gerald Vaden. In September 1988, Terry, Vaden and Jack Wilson, the owner of the building Recovery Systems leased, combined to form Cheqnet Systems, Inc. ("Cheqnet"). From that point in time. Cheques became dormant and the operating collection agency was Cheqnet. Cheqnet generally operated on a consignment basis. Merchants would forward customer checks returned for insufficient funds to Cheqnet which would then seek payment from the customer. If no payment was received directly from the customer, the checks were forwarded to the municipal court for prosecution. All funds collected by Cheqnet or the municipal court were deposited into an account of Cheqnet and then the amount of the check was remitted to the merchant. Cheqnet would retain a collection fee authorized by law as payment for its services.

Larry Terry was president of Cheqnet, and Connie and Gerald Vaden vice president and secretary/treasurer respectively. Terry and Vaden each received approximately $100,000 from Wilson for his purchase into the business. The funds were given, in part, by a $50,000 note with a separate agreement that required the corporation to forgive approximately $7,000 on the note each year. In that manner, Terry and Vaden only recognized that amount of income from the transaction in each taxable year. The remainder was obtained in the form of a mortgage coupon bond[2] and a mortgage against the real property owned by Wilson. Thus, based upon the agreement, on October 20, 1988, Cheqnet granted a bond mortgage to Larry Terry and Gerald Vaden in exchange for funds to be used as working capital. The mortgage was recorded on November 15, 1988. Terry received his payments, with interest, on the mortgage each year

1. Cheques was incorporated on March 16, 1983, but its charter was revoked on December 31, 1996. Its charter had not been reinstated at the time of the trial of this proceeding.

2. A mortgage coupon bond is essentially a note payable from the corporation to the individuals, secured by a mortgage. The mortgage in this case describes the real property, the parties, and states that it stands for any debt between the parties and the corporation.

until 1997. Terry also signed a promissory note at the same time for $50,000.

Cheqnet apparently operated fairly successfully until 1994 when it experienced increasing competition from certain municipalities prosecuting "hot check" violations. In reaction to this increasing competition, Cheqnet sought other means of revenue. Specifically, it sought to collect a higher fee for its services than authorized by law. The relevant check collection fee authorized by Arkansas law at the time of these transactions was fifteen dollars per check. Ark.Code Ann. §§ 5–37–303, 5–37–304, 5–37–307. Not finding this amount profitable, Cheqnet filed a declaratory judgment action against the State Board of Collection seeking the ability to collect twenty-five dollars per check. In anticipation of a successful conclusion to their litigation. Cheqnet began collecting twenty-five dollars per check rather than the permitted fifteen dollars. It lost the case. *Cheqnet Systems, Inc. v. State Board of Collection,* 319 Ark. 252, 890 S.W.2d 595 (Ark.1995),[3] and, as a result, was compelled to agree to pay, in the concomitant class action lawsuit. *Cheqnet Systems, Inc. v. Montgomery,* 322 Ark. 742, 911 S.W.2d 956 (Ark.1995)(certifying class), the overcharge exacted from the check writers, plus interest. Only the first payment of $30,000 was made by Cheqnet with funds derived from loans from Larry Terry and Jack Wilson, the principal stockholders of Cheqnet.

As a result of these unsuccessful lawsuits, Cheqnet lost some of its largest customers and suffered a reduction in its line of credit. At this same time, Terry negotiated with a large local grocer to collect checks on its behalf. This contract, however, would require Cheqnet to purchase the checks at eighty percent of their face value. Thus, Cheqnet would be required to put forth a significant initial cash outlay in order to purchase the checks, and, only upon collection, would it realize any profit from the venture. Cheqnet's loss in the class action lawsuit with the Montgomery class, however, was well known, and

Cheqnet could not obtain financing to purchase the checks from the grocer.

Accordingly, the owners of Cheqnet resurrected Cheques, and it began renting office space from Cheqnet. Cheques obtained financing, purchased the checks from the grocer and, informally at first but later, formally, contracted with Cheqnet to process the checks. Specifically, Cheques and Cheqnet entered into a contract under which Cheques retained title to the checks but delivered them to Cheqnet for collection (the amount of the check plus the $20.00 service fee). Cheques agreed to pay Cheqnet seven dollars for each check collected. If collection efforts were unsuccessful, the checks were to be delivered to the Sherwood Municipal Court for processing by the state court system. Initially, all checks were transmitted to the court by Cheqnet employees and under the name of Cheqnet, although its principals later asserted that this was an error and that all processing with the municipal court should have occurred under the Cheques name. In addition to this contract with Cheques, Cheqnet continued to solicit from and collect checks for merchants in the central Arkansas area on a consignment basis. Its basic operations did not change.

The checks in issue in this proceeding are the ones Cheques purchased from the grocer but were collected by Cheqnet through the Sherwood Municipal Court from and after the time of the bankruptcy case filing. Although, at first, the proceeds were paid directly to Cheques from the Sherwood Municipal Court, in May 1997, several months after the filing of the bankruptcy case, the chapter 7 trustee directed the clerk of the Sherwood Municipal Court to deliver all funds to the trustee of the debtor, Cheqnet, rather than to Cheques.

Upon garnishment by the Montgomery class, Cheqnet filed this bankruptcy case on January 31, 1996. At that time, Cheques owed Cheqnet the sum of $7,211 for

---

**3.** The statute was subsequently amended to provide for a collection fee of twenty dollars.

checks collected by Cheqnet pursuant to their agreement.

## II. PROCEDURAL BACKGROUND

Larry Terry and Cheques instituted this adversary proceeding (1) seeking a determination that the checks processed by Sherwood Municipal Court were not, as asserted by the trustee, property of the Cheqnet bankruptcy estate and that Cheques is entitled to all of the proceeds of the funds collected by the Sherwood Municipal Court, and (2) that Larry Terry is entitled to distribution of $50,000 as a secured lien holder of certain real property sold by the trustee.

The trustee filed a counterclaim against Cheques for the funds Cheques owes to the estate and for offset should the Court determine that the checks held by the Sherwood Municipal Court are not property of the estate. In addition, the trustee asserts that the mortgage recorded on November 15, 1988, is defective because Larry Terry does not hold a secured interest in the real property and, thus, is not entitled to distribution of any proceeds as a secured creditor. Finally, the trustee seeks to subordinate any claim of Larry Terry to the claims of other unsecured creditors, extinguish any liens held by Terry and also seeks a judgment in the amount of $15,000 for services rendered by Cheqnet to Terry.

## III. CONCLUSIONS OF LAW

### A. Property of the Estate

■ Cheques was the holder of certain checks purchased from a grocery chain in the central Arkansas area. Cheques contracted with Cheqnet to act as collection agent to recover the proceeds of the checks for a fee of seven dollars per check. Although physical possession of the checks was given to Cheqnet, there is no endorsement to Cheqnet or contract provision regarding title to the checks. Cheqnet subsequently delivered many of the checks to the Sherwood Municipal Court for collection and, after the filing of the bankruptcy case, the proceeds were remitted to the chapter 7 trustee. The trustee asserts that the entirety of the proceeds are property of the estate; Cheques asserts that it is entitled to the proceeds, less the seven dollar fee established by the contract.

■ Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). Property of the estate is also limited to interests of the debtor:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest...becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). While federal bankruptcy law determines the effect of legal or equitable interests in property, *N.S. Garrott & Sons v. Union Planters National Bank (In re N.S. Garrott & Sons)*, 772 F.2d 462, 466 (8th Cir.1985), the Court looks to state law to determine the nature and extent of the interest, *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re N.S. Garrott & Sons*, 772 F.2d at 466. Accordingly, Arkansas law determines the nature and extent of the debtor's interest in the proceeds of the checks. Of course, as discussed above, the estate succeeds only to the title and rights in property the debtor had at the time of the filing of the petition in bankruptcy. *In re N.S. Garrott & Sons*, 772 F.2d at 467.

It is uncontroverted that the debtor, Cheqnet, was a holder of the checks at some point in time. However, Cheqnet subsequently turned over the checks to the Sherwood Municipal Court under Cheqnet's contractual authority to collect the proceeds. In addition, Cheqnet held an equitable interest in the proceeds, at least to the extent of seven dollars per check, under its contract with Cheques.

Thus, the debtor held some legal and equitable interest in the checks and this interest became property of the estate upon the filing of the petition.

The fact that the debtor was entitled to receive seven dollars for each check collected, however, does not render all of the proceeds property of the estate. Although, prior to turning the checks over to the Sherwood Municipal Court, it was a holder of the checks—negotiable instruments—it was not a holder in due course, *see generally* Ark.Code Ann. § 4-3-302, and thus did not take the checks free of the claims of any other entity having a prior claim or right to the checks, *see* Ark.Code Ann. § 4-3-305. Although Cheqnet held the checks at one point and had the right to enforce the instruments, its rights were not necessarily superior to those of Cheques. Thus, although property of the Cheqnet estate may consist of the right to enforce the instruments, its rights are subject to the contract with Cheques, and Cheques' rights to the proceeds, less the seven dollar fee to Cheqnet. Accordingly, the entirety of the proceeds of the checks delivered by Sherwood Municipal Court from the grocer are not property of the estate. Pursuant to the contract, the property of the estate consists of the proceeds as limited by the contract, seven dollars per check.

### B. Capacity to Sue

■ Although the Court has made a determination as to property of the estate,

Cheques has no capacity to sue to recover any funds obtained by the trustee. The trustee is correct in his assertion that Cheques does not have the capacity to sue because its corporate charter was revoked prior to the filing of the lawsuit.[4] It is undisputed that the Secretary of State revoked Cheques corporate charter on December 31, 1996, and, as of the time of the filing of the lawsuit and trial, it had not been reinstated. Rule 7017, Federal Rules of Bankruptcy Procedure, provides that the capacity of a corporation to sue is determined by the law under which it is organized. Thus, Cheques capacity to sue is governed by substantive Arkansas law.

■ It is well settled under Arkansas law that a corporation not in existence may not initiate a lawsuit.[5] *See First Commercial Bank v. Walker,* 333 Ark. 100, 969 S.W.2d 146, 152-53 (Ark.1998). Thus, following the revocation of its corporate charter, Cheques lost its capacity to sue, and any lawsuit it filed during this status must be dismissed. *See id.* A subsequent reinstatement of the corporate status does not retroactively restore or otherwise vest the corporation with a continuous existence. *Tribco Manufacturing Co. v. People's Bank of Imboden,* 67 Ark.App. 268, 998 S.W.2d 756, 759 (Ark.Ct.App.1999).[6] Moreover, Ark.Code Ann. § 26-54-112 governs the legal effect of reinstatement which provides only that once a charter is reinstated, the corporation shall *thereafter*

4. The Court properly receives this exhibit into evidence. Cheques can hardly be surprised by the defense since it was by its own actions that its corporate charter was revoked. Moreover, there is no showing that there was any right to believe the defense would not be asserted or that it relied upon the failure to assert the defense. *See generally Tribco Mfg. Co. v. People's Bank of Imboden,* 67 Ark.App. 268, 998 S.W.2d 756 (Ark.Ct.App.1999).

5. This does not mean, however, that the corporation is dissolved or that it does not hold title to property. *See In re Russell,* 123 B.R. 48 (Bankr.W.D.Ark.1990). Thus, the corporation may continue to exist for limited purposes. The fact that it may hold title or take certain actions under the Arkansas Business

Corporation Act, Ark.Code Ann. § 4-27-101, *et seq.,* does not necessarily mean that a corporation with a revoked charter for failure to comply with the requirements of Arkansas law must have the same rights to sue as a corporation seeking dissolution under the provisions of Arkansas law.

6. The Court does not take into consideration the certificate of reinstatement from the Secretary of State submitted November 10, 1999, for the first time with Cheques' reply brief, filed on November 10, 1999. This document reflects only that, as of November 8, 1999, nearly three months after the conclusion of the instant trial, the corporation is "chartered and in good standing."

be treated as if its name had not been declared forfeited. Thus, as in *Tribco Manufacturing*, a subsequent reinstatement of the corporate charter does not serve to retroactively validate the initiation of the lawsuit by Cheques.[7] Accordingly, the cause of action by which Cheques seeks recovery, Count I of the complaint, will be dismissed.[8]

## C. Mortgage Issues

When Wilson purchased his interest in Cheqnet, Terry took part of the consideration in the form of a mortgage coupon bond secured by a mortgage on the real property which had been owned by Wilson. The mortgage includes recitations that the secured parties are Gerald Vaden and Larry Terry, the legal description of the real property, that the mortgage is to secure all debts and is to be "security for any other indebtedness of whatsoever kind that the Grantee or the holders or owners of the Mortgage may hold against grantors..." The trustee asserts that this mortgage is not valid because, among other grounds, the amount and terms of repayment are not recited.

In order to be a valid mortgage, Arkansas law requires that it must be in writing, provide a description sufficient to give notice of the property securing the debt and a description of the debt sufficient to give notice of the liability and to whom inquiry may be directed. *See generally* P. Jones, *Arkansas Law of Title to Real Property*, 547, 549 (1939 & 1959 supp.). For example, although it is usual to state the amount of the debt to be secured, Arkansas law does not require that it be stated in the mortgage. Rather, if the mortgage is sufficient to put a person examining the record on inquiry and directs that person to a proper source of more information the mortgage is valid. *Curtis & Lane v. Flinn,* 46 Ark. 70 (Ark.1885)(mortgage which stated that the mortgagor was "justly indebted" and sought to secure "the full and prompt payment of what he now owes or may hereafter become indebted" sufficient); *Howell v. Walker,* 111 Ark. 362, 164 S.W. 746 (Ark. 1914); *Cazort & McGehee Co. v. Dunbar,* 91 Ark. 400, 121 S.W. 270 (Ark.1909); *Hoye v. Burford,* 68 Ark. 256, 57 S.W. 795 (Ark.1900)(mortgage properly secured "all indebtedness that I owe" mortgagee). Similarly, the mortgage appears to be executed, acknowledged, ratified and sufficiently binding upon all parties to render it valid, *see O'Neal v. Judsonia State Bank,* 111 Ark. 589, 164 S.W. 295 (Ark.1914), and enforceable against third parties.

## D. Subordination

Section 510(c) of the Bankruptcy Code permits the Court to apply principals of equitable subordination to allowed claims. Equitable subordination is applied on a case by case basis *Black v. Brando* (*In re Black Ranches, Inc.*), 362 F.2d 19, 37 (8th Cir.), *cert. denied,* 385 U.S. 990, 87 S.Ct. 596, 598, 17 L.Ed.2d 450, 451 (1966), and cases in which insider transactions are at issue will be more closely scrutinized, *Bergquist v. Anderson–Greenwood Avia-*

---

7. This authority provides only that activation of the corporate status does not validate a lawsuit filed while the corporation was in an inactive status. That is distinct from the situation in which a corporation, which becomes active again and is authorized to do business by the State of Arkansas, and then initiates a lawsuit to recover a debt incurred to it while it was not so chartered. Thus, while *Tribco Manufacturing* appears to preclude this lawsuit, it would not necessarily apply to preclude a suit filed after November 1999, the date of reinstatement, regarding the same subject matter. In any event, because the court has determined the extent of the estate's interest in the funds being generated by the Sherwood Municipal Court, there remain future avenues established by the Bankruptcy Code for creditors of the estate to preserve and assert their rights.

8. Cheqnet timely objected to the introduction of this document and that objection was overruled as relevant to the subordination issue, discussed below. In any event, the Court may consider the assertion that the corporation did not have the capacity to initiate the lawsuit at the time it was filed. *See First Commercial Bank v. Walker,* 333 Ark. 100, 969 S.W.2d 146, 152–53 (Ark.1998).

*tion Corp. (In re Bellanca Aircraft Corp.),* 850 F.2d 1275, 1282 n. 13 (8th Cir.1988); *In re Spring Grove Livestock Exchange, Inc.,* 205 B.R. ° 149, 162 (Bankr.D.Minn.1997)(level of misconduct necessary for equitable subordination varies with the relationship between the parties). Equitable subordination requires a showing that the claim holder engaged in inequitable conduct, that the conduct caused injury to a creditor or conferred an unfair advantage to the claim holder, and that equitable subordination is not inconsistent with the Bankruptcy Code. *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 850 F.2d 1275, 1282 (8th Cir.1988).

■ The trustee asserts that Larry Terry, as a principal of Cheqnet and therefor an insider, diverted revenue from Cheqnet to Cheques to the disadvantage of the Montgomery class of creditors. While it is true that Terry originally intended Cheqnet to be the party to purchase the grocer's checks and that, instead, his corporation, Cheques, received the income, there was neither inequitable conduct nor motive to ultimately redirect the revenue. The only reason Cheqnet was able to garner any income from a contract relating to the grocer was because Terry resurrected Cheques. Cheqnet could not have obtained the contract in any event because it could not acquire the financing to purchase the checks from the grocer. Had Terry not resurrected Cheques to obtain financing and enter into the contract, neither Cheques nor Cheqnet would have realized the opportunity to contract with this particular grocer. The fact that Terry supplied some of the funds with which the Montgomery class was paid any funds further supports the finding that there was no inequitable conduct in his actions: he was attempting to facilitate payment, not thwart collection efforts. The other facts listed by the trustee do not necessarily constitute inequitable conduct. Rather, it appears that Cheqnet was failing and its earlier contracts were lost resulting in insufficient revenues. Cheques, for its part, simply did not pay its franchise taxes before any of the relevant events took place. These matters are not conduct which either conferred an unfair advantage upon Larry Terry or which caused the injury to other creditors. The fact that Cheqnet was thereafter unable to make the appropriate payments and, upon garnishment by the Montgomery class, filed the bankruptcy case, does not render the conduct inequitable.

## E. Monetary Judgments

**1. Against Cheques.** The trustee seeks judgment against Cheques in the amount of $7211.00 for the services rendered by Cheqnet. Although Cheques has apparently declined to remit the amount admittedly owed due to Cheqnet's inability to fulfill the remainder of the contract, no real defense has been offered to the action. Accordingly, judgment will be rendered in favor of the trustee on Count I of the counterclaim.

■ **2. Against Larry Terry.** Larry Terry executed a promissory note to Cheqnet in 1988, and each year he made a payment on the note. Each year, subsequent to the payment by Terry, the corporation forgave the payment requirement for that year and issued a check to Terry for the payment remitted. At the time of the filing of the bankruptcy, $15,000 remained owing on that debt. There is no corporate resolution or other action forgiving the remainder of the debt, and, as pointed out by the trustee, the forgiveness of subsequent payment is at the discretion of the corporation, not Larry Terry. The trustee, having succeeded to the interests of the corporation, is entitled to require payment of the note. Other than his claim that it had been forgiven in the past, Terry raises no defense to the trustee's right to collect that debt. Accordingly, the trustee is entitled to require payment of the promissory note and judgment on Count IV of the counterclaim shall be issued in his favor.

**ORDERED** as follows:

1. Count I of the Complaint is dismissed.

2. The mortgage recorded on November 15, 1988, is valid and enforceable such that judgment shall be rendered in favor of Larry Terry on Count II of the complaint and Counts I and II of the counterclaim

3. Judgment shall be rendered in favor of the Trustee and against Cheques, Inc. in the amount of $7,211.00 on the counterclaim.

4. Equitable subordination under 11 U.S.C. § 510(c) is not appropriate such that judgment will be rendered in favor of Larry Terry on Count III of the counterclaim.

5. Judgment in favor of the trustee and against Larry Terry shall be rendered on Count IV of the counterclaim in the amount of $15,000 plus interest as required by the note.

**IT IS SO ORDERED.**