**Pinkney SUTTON, Executor of the Estate of Charles A. Sutton, Deceased, and Wilene B. Sutton, Plaintiffs-Appellees,**

v.

**The FIRST NATIONAL BANK OF CROSSVILLE, Defendant-Appellant.**

Court of Appeals of Tennessee, Eastern Section.

June 23, 1981.

Application for Permission to Appeal Denied by Supreme Court Aug. 24, 1981.

---

Joe M. Looney of Looney, Looney & Conner, Crossville, for defendant-appellant.

Dale Bohannon of Cameron & Madewell, Cookeville, for plaintiffs-appellees.

OPINION

GARLAND, Special Judge.

This is an action by Pinkney Sutton, Executor of the estate of Charles A. Sutton, deceased, and Willene B. Sutton, his widow,

for breach of an alleged contract to procure credit life insurance on a construction loan made by the defendant, The First National Bank of Crossville.

The trial judge sitting without the intervention of a jury found in favor of the plaintiffs, and cancelled the indebtedness owing to the defendant bank under a promissory note dated March 14, 1978, and held said note and deed of trust securing the same to be unenforceable.

In the fall of 1977, Mr. & Mrs. Charles Sutton, residents of Calhoun, Georgia, decided to build a house at Lake Tansi in Cumberland County, Tennessee. They intended to commence the construction thereof with personal funds, and after depleting the same, obtain a construction loan to complete the house. With this in mind, they went to the defendant bank at Crossville and talked to Randy Swafford, a vice-president and loan officer of the bank, about obtaining a construction loan when needed. Although the record is silent on the point, subsequent events indicate that the Suttons left with the understanding that they could get a construction loan when needed. Mrs. Sutton testified that credit life insurance was not mentioned on this occasion.

No further contact or communication was had between the parties until March 14, 1978, at which time said house was under construction. On this date, Mrs. Sutton went to the defendant bank to arrange for a construction loan. Mr. Sutton did not go in order to avoid losing a day's work. He intended to go to the bank after all loan papers had been prepared and close the loan. Mr. Swafford told Mrs. Sutton that that would not be necessary; that she could take the documents to Georgia for his signature and return them by mail. Mrs. Sutton testified that credit life insurance was not mentioned on this occasion.

While Mrs. Sutton waited, Mr. Swafford prepared a loan application, financial statement, disclosure statement, note in the amount of $15,000.00 payable six months after date, and a deed of trust.

The disclosure statement gives rise to the dispute in this case. The following information was given in block form on the disclosure statement:

| | |
|---|---|
| Total Payments | $15,712.50 |
| Finance charge | 712.50 |
| Amount financed | 15,000.00 |
| Annual percentage rate | 9.5% |
| Registration fees | 20.50 |
| Non-filing insurance | 300.00 |
| Search, filing, recording, legal or releasing fees | 180.00 |
| Due date of payment | 09/14/78 |
| Amount of payment | 15,000.00 |

No entry was made in the blocks provided for credit life insurance charge, disability insurance charge, property insurance charge or taxes.

In addition, the disclosure statement contained the following language under the caption "INSURANCE":

"CREDIT LIFE AND DISABILITY INSURANCE is not required to obtain this loan. No charge is made for credit insurance and no credit insurance is provided unless the borrower/purchaser signs the appropriate statement below:

(a) The cost of Credit Life Insurance alone will be $_____ for the term of the credit.

(b) The cost of Credit Life and Disability Insurance will be $_____ for the term of the credit.

| I desire Credit Life and Disability Insurance | | | I desire Credit Life Insurance only |
|---|---|---|---|
| | | | X |
| (Date) | (Signature) | (Date) | (Signature) |

I DO NOT want Credit Life or Disability Insurance

| 3/14/78 | _____." |
|---|---|
| (Date) | (Signature) |

As shown above, the typewritten date, 3/14/78, appeared under the statement "I DO NOT want Credit Life or Disability Insurance."

Mr. Swafford placed a red X at the various places on the loan documents where Mr. Sutton was to sign, including a red X on the signature line shown above, and instructed Mrs. Sutton to have her husband sign at the places indicated.

Mrs. Sutton took these documents to Georgia where they were executed, acknowledged, and returned to Mr. Swafford by mail. Mr. Sutton signed under the statement, "I desire Credit Life Insurance only."

Mr. Swafford testified that he remembered receiving the envelope containing the loan documents; that it was his normal procedure to leaf through loan documents to determine if the signatures were in the correct places; that he assumed that he leafed through the Sutton documents; and that if he had noticed Mr. Sutton's signature under the statement, "I desire Credit Life Insurance only", he would have contacted the Suttons to see if a "mistake" had been made, and if not, he would have taken the premium from the proceeds of the loan and marked it as an advance on the loan. At any rate, no credit life insurance was obtained on this loan.

The Sutton's son, Pinkney Sutton, constructed the house for his parents, and made the draws at the defendant bank on the construction loan.

After the loan of March 12, 1978, the Suttons had no further contact or communication with the defendant bank until May 12, 1978, at which time Mrs. Sutton went to the bank and requested an additional $4,000.00 to complete the house. Mr. Swafford approved, and prepared a note and disclosure statement. Mr. Swafford considered this loan to be an extension of the first, and secured by the same trust deed. Mr. Swafford "elected" to put credit life insurance on this loan even though, as in the case of the first loan, Mrs. Sutton testified that credit life insurance was not mentioned. The disclosure statement used on this occasion was on a completely different form from that used on the first loan, and showed an entry of $29.19 for credit life insurance. Mrs. Sutton took the note and disclosure statement to Georgia where they were signed and returned by mail.

Mr. Swafford had no independent recollection of his conversation with Mr. & Mrs. Sutton in the fall of 1977, or of his discussion with Mrs. Sutton on March 12, 1978, or on May 12, 1978.

Mr. Sutton became ill in the latter part of March, and died on June 18, 1978. Pinkney Sutton had advised Mr. Swafford of his father's illness prior to May 12, 1978, and Mrs. Sutton advised him of her husband's illness on that date. After Mr. Sutton's death, Mr. Swafford advised Mrs. Sutton that there was credit life insurance on the second loan, but not on the first, giving rise to this lawsuit.

The issue in this case is whether there was a contractual duty on the part of the defendant bank to procure credit life insurance. In other words, did the language pertaining to credit insurance, as embodied in the loan disclosure statement, constitute an offer by the defendant bank to procure such insurance, and if so, was there an acceptance by Charles Sutton supported by a valid consideration?

The defendant contends that the only function of the loan disclosure statement was to give notice to the Suttons of credit terms in compliance with the Consumer Credit Protection Act, 15 U.S.C. Sec. 1601, et seq., Subchapter 1 thereof being known as the Truth in Lending Act, and the regulations promulgated thereunder (Regulation Z) by the Federal Reserve Board, 12 Code of Federal Regulations, Sec. 226.1 et seq.; that the section on insurance in the disclosure statement was not intended as an offer to procure credit insurance; and that there was no mutual assent or meeting of minds between the parties.

The defendant cites *Burgess v. Charlottesville Savings & Loan Association*, 349 F.Supp. 133 (1972), and *Peer v. First Federal Savings and Loan Association of Cumberland*, 273 Md. 610, 331 A.2d 299 (1975), in support of its contentions.

In the *Burgess* case, *supra*, the plaintiff and her husband made application for a mortgage loan to purchase a house. Later, the defendant association mailed several loan documents, including a Regulation Z disclosure statement, to the plaintiff and her husband. The disclosure statement contained a similar section on credit insurance which they signed under the statement, "I desire Credit Life & Disability Income insurance coverage." Mrs. Burgess returned the disclosure statement to the defendant at the loan closure on May 12, 1971, at which time the loan proceeds were disbursed. Mr. Burgess was not present.

Virginia law required that the person to be insured make application for such insurance on a form approved by the State Corporation Commission. According to testimony on behalf of the defendant, Mrs. Burgess was advised at the loan closing on May 12, and again by telephone on May 20, that an application would have to be filled out by the Burgesses in order to obtain credit insurance. This testimony was denied by Mrs. Burgess. Further, by letter dated May 21, the defendant furnished the Burgesses with an itemized statement of their monthly payments in the total amount of $176.00, which itemization did not include any charge for credit insurance. The Burgesses made their first payment on June 2, 1971, in the amount of $176.00. They never filled out the application required by Virginia law. Mr. Burgess was killed on June 16, 1971. The defendant had not procured credit life insurance as in the instant case.

The District Court held that the purpose of the Truth in Lending Act was to insure that a borrower is aware of the real and comparative cost of credit prior to entering into a contractual relationship with a lender; that the section on insurance in the disclosure statement was not intended to form a contract to procure insurance; that the disclosure statement in and of itself could not constitute a contractual relationship; and that even if there was such a contract, a necessary condition precedent to performance by the defendant was the completion of an insurance application by the Burgesses as required by Virginia law.

Based upon the facts and applicable Virginia law, we agree with the result reached by the District Court. However, we do not agree with the opinion to the extent that it held that a disclosure statement could not be the basis for the creation of a contract to procure credit insurance. Furthermore, on appeal of the Burgess case, the Fourth Circuit Court of Appeals did not agree with this view of a disclosure statement as made by the District Court. Burgess, 477 F.2d 40 (1973). The Court of Appeals held that federal subject-matter jurisdiction was lacking, and directed that the case be remanded to the State Court from which it

was removed. In reaching that conclusion, the Court of Appeals said:

"It is plain that, giving effect to the principles just stated, federal subject-matter jurisdiction is absent in this case. The real basis on which plaintiff plants her cause of action is an alleged contract to procure insurance ... *It is true the alleged agreement had its 'origin' in a notice form intended by the defendant as compliance with the Act and the Regulations issued by the Federal Reserve System. That, however, was purely coincidental. Whether the form was one designed to comply with the Truth in Lending Act or not was unimportant; the basic issue in the case was whether the language used by the defendant in its form of loan application was sufficient to be the basis for the creation of a contractual right ant that issue, all parties agree, is determinable solely by Virginia law, not federal law.*" (Emphasis added).

477 F.2d 44.

The *Peer* case, *supra*, cited by the defendant in support of its contentions, quotes from the District Court's opinion in the *Burgess* case, and employs the same rationale as to the function of a disclosure statement.

■ Neither the Truth in Lending Act nor Regulation Z adopted pursuant thereto prescribe a particular form to be used in compliance therewith. The disclosure form used by the defendant bank was of its own choosing. Further, neither the Act nor Regulation Z prohibit matters other than a disclosure of credit terms from being incorporated in the disclosure statement. For example, a promissory note, security agreement and disclosure of credit terms may all be incorporated in a single instrument. We therefore hold that a loan disclosure statement may contain an offer to procure credit insurance as well as notice of credit terms given pursuant to the Truth in Lending Act. And, as stated by the Court of Appeals in the *Burgess* case, *supra*, whether the form was one designed to comply with the Act or not is unimportant; the basic

issue being whether the language used by the defendant in its disclosure statement constituted an offer to procure credit insurance.

■■■■ The defendant contends that it did not intend the language used in its disclosure statement to constitute an offer to procure credit insurance. If the language of a written instrument is clear and unambiguous, the court must interpret it as written, rather than according to the unexpressed intention of one of the parties. *Nashville Electric Supply Company, Inc. v. Kay Industries,* Tenn.App., 533 S.W.2d 306 (1975); *Petty v. Sloan,* 197 Tenn. 630, 277 S.W.2d 355 (1955); *Associated Press v. WGNS, Inc.,* 48 Tenn.App. 407, 348 S.W.2d 507 (1961). As stated in Corpus Juris Secundum:

> "The apparent mutual assent, essential to the formation of a contract, must be gathered from the language employed by them, or manifested by their words or acts ... The undisclosed intention is immaterial in the absence of mistake, fraud, and the like, and the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts." 17 C. J. S. Contracts Sec. 32.

Aside from the foregoing rule of construction and based upon the position and location of the parties, and all the facts and circumstances, we are of the opinion that the defendant intended the language used in its disclosure statement to be an offer to procure credit insurance. The defendant did not require a borrower to fill out a separate application for credit insurance (as was required in the *Burgess* case under Virginia law). The defendant's loan application form did not contain any provision as to whether a borrower did or did not want credit insurance. The section on insurance in the disclosure statement was the only place in all the loan documents where Mr. Sutton could indicate his desire for credit insurance and give his written consent to the procurement thereof. The section on insurance in the disclosure statement gave borrowers three options. Why give borrowers an option if it was not intended as an offer to procure credit insurance? Further, when the loan documents were mailed to the Suttons, credit insurance had never been mentioned; hence, no charge for credit insurance was shown on the disclosure statement. It follows that all reference to credit insurance could have been omitted in its entirety from the disclosure statement without violating the Truth in Lending Act. Consequently, the inclusion of the section on credit insurance was totally irrelevant to this loan unless it was intended by the defendant as an offer to procure credit insurance. That it was so intended may be inferred from the fact that it was to the defendant's advantage to procure credit insurance on all loans as it received forty percent (40%) of the premiums.

The defendant's brief states: "The plaintiffs have relied heavily upon the peculiar language of the disclosure statement involved in this case..." If peculiar, it was the defendant's language. However, we see nothing peculiar about the language used. There is nothing ambiguous in the statement:

> "No charge is made for credit insurance and no credit insurance is provided unless the borrower/purchaser signs the appropriate statement below."

The meaning is clear. Paraphrased in the affirmative, the defendant said to the Suttons:

> A charge will be made for credit insurance and credit insurance will be provided if you sign the appropriate statement below.

The language used by the defendant clearly constituted an offer to procure credit insurance. It is not susceptible to any other reasonable construction, and it was so construed by Mr. Sutton.

The defendant contends that Mr. Swafford inadvertently placed a red X on the wrong signature line, and assumes that the presence of a red X at that location was the only reason that Mr. Sutton signed on that line. The defendant states in its brief:

> "One must only assume that had the Bank officer, Randy Swafford, checked

the disclosure statement in the correct spot or as it was prepared indicating 'I do not desire credit life' that this problem would have never arisen."

Such an assumption is not warranted by the facts. Mrs. Sutton testified on re-cross examination as follows:

"Q. Well, did you discuss the paperwork with Mr. Sutton on the way to the notary or at the notary or did you discuss it at all?

A. I don't remember whatever discussion there was except just in our determining where the papers, the different forms should be signed.

Q. No particular discussion other than to make sure that you signed everywhere there was a red check mark?

A. Where he wanted to sign. He noticed, he did want to sign on the line, 'I do desire Credit Life Insurance.' There was an 'x' one place and the date another. He wanted insurance and he found that line to sign.

Q. You remember that distinctively, he made a point to look to make sure he signed on the right line?

A. Yes, he noticed the date and the 'x' being on different lines, we did. And then he signed the line that he wanted to sign."

Mr. Sutton did not sign beside the red X merely because of its presence at that location—he signed there because he wanted credit life insurance. He did not make a "mistake" in signing under the statement quoted above. To him, credit life insurance was an important and vital part of the transaction. As stated in *Watkins v. Valley Fidelity Bank & Trust Company*, 63 Tenn. App. 493, 474 S.W.2d 915, at 918 (1971):

"Credit life insurance is also a very important and vital part of the transaction to the borrower because it offers absolute protection to his estate for the unpaid balance of the debt in the event of his death before payment in full."

By signing the appropriate statement Mr. Sutton accepted the defendants offer to procure credit life insurance, and thereby obligated himself to pay a premium charge

therefor and authorized the defendant to deduct the premium from the proceeds of the loan—just as the other loan charges were to be deducted. Mr. Swafford testified that if he had known the Suttons wanted credit insurance he could have gotten it, and would have taken the premium from the proceeds of the loan and marked it as an advance. Mr. Swafford assumed that he leafed through the loan documents when they were returned to him. The Suttons cannot be charged with his failure to observe that Mr. Sutton had accepted the bank's offer to procure credit life insurance, nor with the bank's failure to deduct the premium from the loan proceeds and procure credit life insurance. The Suttons did not know that the premium had not been deducted.

■ Mr. Sutton's acceptance of the defendant's offer is supported by a valuable consideration. A valuable consideration is either a benefit to the party promising or a prejudice or trouble to the party to whom the promise is made. *Dixon v. Manier*, 545 S.W.2d 948 (Tenn.App., 1976). Here, there was both a benefit to the promisor and a prejudice to the promisee. The bank was to receive forty percent of the premium and the Suttons obligated themselves to pay a charge for insurance coverage. In *Dark Tobacco Growers' Co-op Assn. v. Mason*, 150 Tenn. 228, 263 S.W. 60, at page 67 (1924), the Supreme Court said: "It is invariably held that the promise of one party is a valid consideration for the promise of the other party." The bank promised to provide credit insurance if Suttons so elected by signing the appropriate statement. The Suttons did so elect by signing the appropriate statement, and by signing, promised to pay a charge for such insurance.

■ The defendant contends that there was no meeting of minds between the parties because credit insurance had never been discussed. A preliminary discussion prior to entering into a contract is not essential to the formation of a contract. *Richardson v. McGee*, 193 Tenn. 500, 246 S.W.2d 572 (1952). The fact that credit

insurance had not been discussed did not prevent the defendant from making an offer in writing to provide such insurance. Every contract results from an offer and the acceptance thereof. The defendant offered to provide credit insurance—Mr. Sutton accepted the defendant's offer. There was a meeting of minds.

Further, the circumstances surrounding the issuance of credit life insurance on the second loan obtained by the Suttons shows that even the bank considered any discussion as to such insurance irrelevant. The procedure by which the bank obtained Mr. Sutton's signature to the second loan documents was identical to that of the first loan. Mr. Swafford "elected" to put credit life insurance on the second loan even though, as in the case of the first loan, there had been no discussion of credit life insurance between the Suttons and Mr. Swafford.

For the foregoing reasons, the judgment of the trial court is affirmed with all costs taxed to the defendant.

PARROTT, P. J., and SANDERS, J., concur.