IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 12, 2019 Session

## CECILIA GONZALEZ v. MAURICIO GONZALEZ

**Appeal from the Chancery Court for Shelby County**
**No. CH-10-0635     Jim Kyle, Chancellor**

_____

### No. W2018-01673-COA-R3-CV

_____

This is an appeal from a final decree of divorce. Husband/Appellant argues that the trial court erred in granting a divorce and in enforcing the parties' Marital Dissolution Agreement ("MDA"). The basis of Husband's argument is that the parties' marriage is void as bigamous because Wife/Appellee was married at the time the parties married. The trial court held that Wife's Chilean marriage was void *ab initio*, thus rendering the parties' marriage valid. As such, the trial court granted Wife a divorce and enforced the MDA. Husband appeals. We vacate the amount of attorney's fees awarded to Wife under the MDA due to a lack of findings concerning the amount and reasonableness thereof. The trial court's order is otherwise affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Vacated in Part; Affirmed in Part; and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Tiffany Taylor Bowders, and Anne B. Davis, Memphis, Tennessee, for the appellant, Mauricio Gonzalez.[1]

Matthew R. Macaw, Memphis, Tennessee, for the appellee, Cecilia Gonzalez.

---

[1]  We note that Mr. Gonzalez's appellate counsel was not his counsel at trial. It appears that Mr. Gonzalez changed attorneys six times during the course of these proceedings.

# OPINION

## I. Background

This is the second appeal of this divorce. Appellant Mauricio Gonzalez ("Husband") and Appellee Cecilia Gonzalez ("Wife") married on April 16, 2001 in Florida. One child was born to the marriage in 2002. As set out in *Gonzalez v. Gonzalez*, No. W2012-02564-COA-R3-CV, 2013 WL 4774139 (Tenn. Ct. App. Sept. 5, 2013) ("*Gonzalez I*"), Ms. Gonzalez filed a complaint for divorce on April 5, 2010. Mr. Gonzalez answered and alleged that the parties were not legally married because, at the time of their wedding, Ms. Gonzalez was still married to her first husband, Carlos Escala, whom she wed in Chile in 1991 (the "Chilean marriage"). On August 17, 2011, Mr. Gonzalez filed a motion to dismiss Ms. Gonzalez's complaint for divorce, arguing that there was no legal marriage. Mr. Gonzalez supported his motion with the following documents: (1) the parties' marriage license from Florida; and (2) a Chilean certificate of marriage (and official translation) showing that Ms. Gonzalez married Mr. Escala in Chile in 1991. On August 29, 2011, Mr. Gonzalez filed a memorandum of law regarding annulment, arguing that, because Ms. Gonzalez was married to Mr. Escala when she married Mr. Gonzalez, the parties' marriage was void *ab initio*, and Mr. Gonzalez was entitled to an annulment. Mr. Gonzalez supported this memorandum with the following documents: (1) the translation of the Chilean marriage certificate for Ms. Gonzalez's marriage to Mr. Escala; (2) the parties' marriage license from Florida; and (3) a Chilean lawyer's translated affidavit stating that Ms. Gonzalez and Mr. Escala's marriage was null, and explaining the effect of the nullification. The trial court ultimately granted Mr. Gonzalez's motion to dismiss, holding that Ms. Gonzalez was married in Chile at the time of her marriage to Mr. Gonzalez such that the marriage to Mr. Gonzalez was void.

On September 18, 2012, Ms. Gonzalez filed a Rule 60.02 motion, which was supported by: (1) a translation of a January 11, 2005 Chilean court ruling stating that Ms. Gonzalez's marriage to Mr. Escala was "null and void"; and (2) a "Legal Report" from a Chilean lawyer explaining the effect of the nullification of Ms. Gonzalez's marriage to Mr. Escala. There was no hearing on Ms. Gonzalez's motion. By order of October 3, 2012, the trial court dismissed all remaining matters and denied Ms. Gonzalez's motion on its finding that the parties' marriage was "null and void." Ms. Gonzalez appealed, and, in *Gonzalez I*, we reversed the trial court's denial of a hearing on her Rule 60 motion, and we remanded the case for consideration of the same.

Following remand from *Gonzalez I*, on November 24, 2014, Mr. Gonzalez filed an answer to Ms. Gonzalez's Rule 60 motion. In December 2014, at the request of the trial court, the parties filed memoranda of law concerning whether Ms. Gonzalez's Chilean marriage was valid or void *ab initio*. By order of December 17, 2014, the trial court granted Ms. Gonzalez's Rule 60 motion on its finding that Ms. Gonzalez's "marriage in Chile was void *ab initio* because it failed to comply with the mandatory provisions of

Chilean law." The trial court allowed Ms. Gonzalez to proceed on her original complaint for divorce.

On or about August 3, 2017, the parties entered into a Marital Dissolution Agreement ("MDA"). As is relevant to this appeal, the MDA provides:

> The parties affirm Wife's need of rehabilitation so as to allow her to provide for herself without the support of Husband. In order to be rehabilitated, Wife needs to secure a four-year degree from a college or university, and Wife intends (and has already registered) to attend the University of Memphis and pursue a bachelor[']s degree. Wife anticipates completing the course work necessary to receive said bachelor[']s degree in four (4) years, and upon receipt of said bachelor[']s degree, Wife will be fully rehabilitated. Accordingly, Husband shall pay to Wife as rehabilitative alimony the sum of $961.00 per month for forty-eight (48) consecutive months commencing on August 1, 2017 and ending on July 31, 2021, for a total of $46,128.00. Such payment . . . shall be made on a weekly basis in the amount of $221.77 per week.

***

> Should either party incur any expense or legal fees as a result of the breach of any portion of this Marital Dissolution Agreement, whether contractual or otherwise, by the other party, the Court shall award reasonable attorney's fees and suit expenses to the non-defaulting party.

An uncontested divorce hearing was scheduled for August 21, 2017. However, on August 17, 2017, Mr. Gonzalez advised Ms. Gonzalez that he was "disavowing the marital dissolution agreement and want[ed] to proceed to trial." In response, on August 21, 2017, Ms. Gonzalez filed a motion to enforce the MDA. The trial court set the matter for trial on August 20, 2018.

On August 20, 2018, before the trial began, Mr. Gonzalez requested a continuance to have certain portions of the Chilean marriage statutes translated into English and presented to the trial court, discussed *infra*. The trial court denied this motion and proceeded to trial on the merits. By order of August 21, 2018, the trial court, *inter alia*: (1) granted Ms. Gonzalez's motion to enforce the MDA; (2) affirmed its grant of Ms. Gonzalez's Rule 60 motion, which declared the parties legally married; (3) held that the MDA was valid and enforceable; (4) awarded Ms. Gonzalez rehabilitative alimony under the MDA, but modified the start date to September 1, 2018; and (5) ordered the alimony to be paid monthly (as opposed to weekly) at a rate of $961.00. The trial court also awarded Ms. Gonzalez $7,000.00 in attorney's fees under the MDA. Mr. Gonzalez appeals.

- 3 -

## II.  Issues

Mr. Gonzalez raises seven issues on appeal, which we restate as follows:

1.  Whether the trial court erred when it denied Mr. Gonzalez's request, on the day of the final trial, for a continuance to present a certified translation of certain Chilean statutes concerning the issues of marriage and annulment.

2.  Whether the trial court erred when it concluded that Ms. Gonzalez's Chilean marriage was null and void.

3.  Whether the trial court erred when it enforced the MDA and awarded the parties a divorce on the grounds of irreconcilable differences.

4.  Whether the trial court erred when it awarded Ms. Gonzalez alimony under the MDA.

5.  Whether the trial court erred when it awarded Ms. Gonzalez $7,000.00 in attorney's fees under the MDA.

In the posture of Appellee, Ms. Gonzalez raises two additional issues:

1.  Whether Mr. Gonzalez waived, is estopped, or is otherwise barred from raising the issue of the validity of his marriage to Ms. Gonzalez.

2.  Whether Ms. Gonzalez is entitled to an award of attorney's fees on appeal.

## III.  Standard of Review

We review a non-jury case "*de novo* upon the record with a presumption of correctness as to the findings of fact, unless the preponderance of the evidence is otherwise." ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000) (citing Tenn. R. App. P. 13(d)).  The trial court's conclusions of law are reviewed *de novo* and "are accorded no presumption of correctness." ***Brunswick Acceptance Co., LLC v. MEJ, LLC***, 292 S.W.3d 638, 642 (Tenn. 2008).

## IV. Denial of Continuance

Mr. Gonzalez begins his appellate argument by stating that "[t]he ultimate issue in this case is whether the parties had a valid marriage."  As an initial matter, Ms. Gonzalez contends that Mr. Gonzalez waived any issue concerning the validity of the parties'

- 4 -

marriage. Specifically, she contends that, despite having four years to prepare and present proof (i.e., translated portions of Chilean marriage statutes) to the trial court, he failed to do so. In support of her waiver argument, Ms. Gonzalez cites Tennessee Rule of Appellate Procedure 36(a), which states that "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). Conversely, on appeal, Mr. Gonzalez argues that the trial court erred in denying him a continuance to provide necessary proof and contends that "the [trial] [c]ourt relied upon an incomplete English presentation of the law in making its ruling [in December 2014]." Neither argument is persuasive.

Concerning Rule 36(a), albeit at the eleventh hour, Mr. Gonzalez did attempt to take action, i.e. he asked for a continuance, for the purpose of providing the trial court evidence he deemed necessary to the question of the validity of the marriage. Accordingly, we cannot conclude that such issue is waived. Concerning whether the trial court erred in denying Mr. Gonzalez's motion for continuance, we review that question under an abuse of discretion standard. **Blake v. Plus Mark, Inc.**, 952 S.W.2d 413, 415 (Tenn. 1997). "The ruling on the motion will not be disturbed unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance." **Id.** (citing **State v. Strouth**, 620 S.W.2d 467, 472, (Tenn. 1981), cert. denied, 455 U.S. 983 (1982)).

To determine whether the trial court abused its discretion in denying Mr. Gonzalez a continuance, it is helpful to review some of the procedural history of the case. We reiterate that, on September 18, 2012, Ms. Gonzalez filed a Rule 60 motion. In this motion, she argued that her marriage to Mr. Escala was void *ab initio*; therefore, her marriage to Mr. Gonzalez was valid. Ms. Gonzalez attached her affidavit, wherein she testified that her marriage to Mr. Escala was never valid. The affidavit provides, in pertinent part:

> 6. That Legal Report from Dina Rosana Valenzuela Mellado, partner with PSV Consultores and Asociados, an expert who received her law degree in 2001 and has practiced in litigation of civil and family matters in Chile since 2001, states that marriage between [Mr. Escala and Ms. Gonzalez] rendered null and void by court judgment never existed in legal terms and, therefore, the parties are reputed as if always having the single status, notwithstanding the date of declaration of such nullification. See Exhibit B;

Exhibit A to Ms. Gonzalez's affidavit is an official translation of the Chilean court judgment, which declared that Ms. Gonzalez's marriage to Mr. Escala was "null and void." Exhibit B to her affidavit is the Legal Report from Ms. Mellado, which provides, in pertinent part:

- 5 -

Further, it is worth noting that by decreeing the nullification of a legal act, it is regarded that it never lawfully came to life; i.e. it never existed. This means that the marriage between the parties rendered null and void by court judgment never existed in legal terms and, therefore, the parties are reputed as if always having the single status, notwithstanding the date of declaration of such nullification.

By restoring the status prior to the declaration of nullity of the aforementioned act the parties are regarded as though they were never married and thus they were always single.

The substance of Ms. Gonzalez's motion was that Chilean law dictated that the Chilean marriage was void *ab initio*. As such, with the filing of Ms. Gonzalez's Rule 60 motion, Mr. Gonzalez was likely on notice that Chilean law, and specifically translations thereof, could be germane to the threshold question of whether the parties' marriage was valid.

On November 25, 2014, the trial court heard Ms. Gonzalez's Rule 60 motion. After oral arguments, the trial court requested that each side file a memorandum concerning Chilean law so it could understand the relevant Chilean law before ruling on whether Ms. Gonzalez's marriage to Mr. Escala was void *ab initio* or valid at the time of the parties' marriage. The trial court's mandate that the parties provide information concerning Chilean law certainly put Mr. Gonzalez on notice that Chilean law would dictate the question of the validity of the parties' marriage.

In response to the trial court's mandate, on December 8, 2014, Ms. Gonzalez filed a memorandum of law, in which she argued that her marriage to Mr. Escala was null and void under Chilean law because it was performed by a Civil Officer, who was without jurisdiction to perform the marriage. Ms. Gonzalez included the original Spanish and English translations of portions of the Chilean law that supported her argument, to-wit:

> Governing provisions for Chilean marriages can be found in various bodies of Chilean law that are attached hereto as Exhibit I. According to Titulo III of Ley Sobre Reistro Civil of the Apendice Del Codigo Civil, Articulo 35 states as follows:
>
> [Original Spanish]

The English translation of the above is as follows:

> A Civil Officer of the district or area where either contracting party has his/her place of abode or where he/she has lived for the three months next preceding the date of the marriage has jurisdiction to solemnize the marriage.

*Civil Code Appendix, Civil Registration Act, Art. 35*.

Further, Articulo 1 of the Ley de Matrimonio Civil states the following:

[Original Spanish]

The English translation of the above is as follows:

> A marriage that fails to be solemnized according to the provisions in this act has no civil effects. The contracting parties are free to abide or not by the requirements and formalities prescribed by their religion. However, said requirements and formalities will be disregarded when deciding on the validity of the marriage or regulating its civil effects.

> *Civil Code Appendix, Law of Civil Marriage, Art. 1*.

Moreover, Articulo 31 of the Ley de Matrimonio Civil states that

[Original Spanish]

The English translation of the above is as follows:

> Any marriage that is not solemnized by the competent Civil Officer and in the presence of such number of witnesses as required in section 16 is also null and void.

> *Civil Code Appendix, Law of Civil Marriage, Article 31*.

Finally, Article 16 of the Ley de Matrimonio Civil states that,

[Original Spanish]

The English translation is as follows,

> The marriage will take place before the official of the Civil Registry in the local public office or in the home of one of the parties and before two witnesses, relatives or strangers.

> *Civil Code Appendix, Law of Civil Marriage, Art. 16*.

Relying on the foregoing Chilean statutes, Ms. Gonzalez argued that, because "neither [Ms. Gonzalez] nor Mr. Escala resided in the District of Las Condes [i.e., where the Chilean marriage ceremony was performed], the Civil Officer of said district did not have jurisdiction to conduct the ceremony." Therefore, she argued that her marriage to Mr. Escala was null and void. Ms. Gonzalez further cited Chilean law concerning "nullities," to-wit:

> Nullities are governed by the same bodies of Chilean law as marriage. According to Article 1681 and 1682 of the Codigo Civil, De La Nulidad Y La Rescision,
>
> [Original Spanish]
>
> The English translation of the above is as follows:
>
>> Article 1681
>>
>> An act or contract is null and void if it lacks any of the requirements prescribed by law for the value of the same act or contract, according to its kind and quality or state of the parties. The nullity can be absolute or relative.
>>
>> Article 1682
>>
>> The nullity produced by an object or unlawful basis, and the nullity produced by the omission of any requirements or formalities prescribed by law for the value of certain acts or contracts in consideration of the nature of them, and not the quality or state of the people who run or agree, are absolute nullities.
>>
>> There are also absolute nullity of acts and contracts for absolutely incapable people.
>>
>> Any other kind of defect produces relative nullity and the right to termination of the act or agreement.
>
> Civil Code, Nullity and Rescission, Art. 1681 and 1682.

Since the marriage ceremony was conducted by an official without proper jurisdiction to conduct same, the marriage [was] null and void because it lack[ed] a lawful basis. The resulting nullity and invalidity [was] absolute, meaning same cannot be cured.

Exhibit 1 to Ms. Gonzalez's memorandum is a certified translation of sections of Chilean marriage statutes.[2]  In addition to the above-quoted statutes, the translation contains additional sections concerning nullification of Chilean marriages, to-wit:

Civil Code

**Title XX**

Nullity and rescission

**Section 1687.**  Nullity under a final court decision grants the parties the right to be restored to the same condition they should have had in the absence of the annulled act or contract, without prejudice to provisions on illegal purpose and consideration.

*** 

Civil Marriage Act

§ 7.  Dissolution of marriage

**Section 37.**  Marriage is dissolved:

1.  By the natural death of either spouse.
2.  By a nullity decision issued by the competent authority.

Exhibit 2 to the memorandum is an official translation of the Chilean court judgment, which declared that Ms. Gonzalez's marriage to Mr. Escala was "null and void."

At this point in the proceedings, there can be no doubt that Mr. Gonzalez was aware that Chilean law was dispositive of the issue of the validity of the marriage.  If he was of the opinion that Ms. Gonzalez's citations to Chilean law, or translations thereof, were incorrect, incomplete, or otherwise flawed, at this point, it was incumbent on him to provide the trial court with countervailing evidence.  This, he did not do.  Rather, on December 12, 2014, Mr. Gonzalez filed his own memorandum of law.  Mr. Gonzalez's entire response to Ms. Gonzalez's arguments concerning Chilean law was as follows:

**Chilean Law**

---

[2] At the final trial, counsel for Mr. Gonzalez explained that he spoke Spanish and admitted that "the translations [Ms. Gonzalez provided] are accurate."

In her Memorandum of Law, Mother argues that this Court should refer to the laws governing marriages in Chile to determine the validity of Mother's marriage to Mr. Escala before determining the validity of the marriage in this case. Mother provides various translations of Chilean law and argues that, under Chilean law, any marriage that is not solemnized by the competent Civil Officer and in the presence of the required number of witnesses is null and void. However, *the retroactive effect applies only to the parties to that marriage, and not to bona fide third parties such as the Father in this case*. In response to Mother's translations of Chilean law, Father has attached the U.S. Embassy certified Affidavit of Jorge Andres Olave Godoy, a lawyer in Santiago Chile, who states as follows with regard to the retroactive effect of a nullity:

> 1. Nullity has a retroactive effect and this means that the act, like in this case marriage, is reputed as though never existed and, therefore, it extinguishes all effects that this contract had.

> 2. **However, it has that effect in respect of the parties, as the effect that it has on a bona fide third parties (those people who had no knowledge of the act itself or of the element that rendered it void, such as the case of Mr. Mauricio Gonzalez), marriage does have effects and to him, it is an event of gross breach of spousal duties on the part of his wife, Cecilia del Pilar Olave Retamal, as she was unable to marry him because she was married in Chile. The same happens if they had children, those children would be considered born inside wedlock.[3]**

The affidavit further states that, if Ms. Gonzalez had married in Chile in 2001, she would have committed the crime of bigamy.

(Emphasis in original).

Mr. Gonzalez did not contest this issue further, and the trial court held that on the evidence before it the Chilean marriage was void *ab initio*. The parties continued with the divorce proceedings for almost four more years after this ruling until the final trial on August 20, 2018. At this latest of dates, Mr. Gonzalez argued, for the first time, that the trial court should have had the benefit of the entire translated Chilean statute before deciding whether Ms. Gonzalez's Chilean marriage was valid. Yet, even then, he did not come to the trial court with translation in hand. Rather, he requested a continuance to

---

[3] Mr. Gonzalez had previously filed Jorge Andres Olave Godoy's affidavit on November 24, 2014, as Exhibit C to his memorandum of law opposing Ms. Gonzalez's Rule 60 motion.

allow him more time to obtain certified translations of the untranslated portions of the statute.

As discussed, *supra*, as early as September 18, 2012, but not later than December 8, 2014, Mr. Gonzalez was on notice that Ms. Gonzalez would rely on the translated portions of the Chilean statutes for her argument that the Chilean marriage was void *ab initio*. Despite numerous opportunities to present his own translations of portions of the Chilean statutes he deemed relevant, he did nothing for almost four years and then implored the trial court for additional time on the day of the final hearing. Having failed to avail himself of ample opportunities to present his evidence, we cannot conclude that the trial court erred in denying Mr. Gonzalez's motion for continuance. Any prejudice resulting from such denial is strictly the result of his own procrastination.

## V. Validity of the Parties' Marriage

We now turn to the question of whether the trial court erred in finding that the parties' marriage was valid because the Chilean marriage was void *ab initio*. Although, "[t]o protect the institution of marriage in Tennessee, regularly solemnized marriages are presumed to be valid," **Guzman v. Alvares**, 205 S.W.3d 375, 380 (Tenn. 2006), "a second marriage cannot be contracted before the dissolution of the first." Tenn. Code Ann. § 36-3-102; **Emmit v. Emmit**, 174 S.W.3d 248, 251 (Tenn. Ct. App. 2005) ("The public policy of Tennessee dictates that bigamous marriages are void."). As the party challenging the validity of the marriage, Mr. Gonzalez bears the burden of proving that it is void as bigamous. **Id.**

As discussed, *supra*, the record contains: (1) relevant passages of Chilean law regarding marriage and the nullity of marriage; (2) translations of the Chilean court's judgment regarding the status of Ms. Gonzalez's marriage to Mr. Escala; and (3) an affidavit/report from Chilean lawyers regarding Chilean marriage laws. As translated, the Chilean court judgment explains, in pertinent part, that the Chilean court rendered Mr. Escala's marriage to Ms. Gonzalez null and void, because, *inter alia*, "at the time of the marriage and for the three immediately preceding months none of the parties had his/her domicile or residence within the jurisdictional area of the officer of the Registration District of Providencia who united them in marriage, as required by [l]aw." The undisputed sections of Chilean law that Ms. Gonzalez provided to the trial court state that only a Civil Officer of the district where the parties live has jurisdiction to solemnize a marriage. COD. CIV. APP., *Civil Registration Act*, Art. 35. Further, "[a] marriage that fails to be solemnized according to the provisions in this [Chilean] act has no civil effects." COD. CIV. APP., *Law of Civil Marriage*, Art. 1.

From his statements at trial, Mr. Gonzalez appears to argue that Ms. Gonzalez's Chilean marriage was annulled as opposed to void *ab initio*. As such, he contends that Ms. Gonzalez was legally married to Mr. Escala until the Chilean court annulled the

marriage by order of January 11, 2005. Thus, he argues that at the time of his marriage to Ms. Gonzalez on April 16, 2001, she was still legally married to Mr. Escala, thus rendering their marriage void as bigamous. *See* Tenn. Code Ann. § 36-3-102. The only evidence to support Mr. Gonzalez's argument is found in Mr. Godoy's affidavit, wherein he stated:

> 1. Nullity has a retroactive effect and this means that the act, like in this case marriage, is reputed as though never existed and, therefore, it extinguishes all the effects that this contract had.
>
> 2. However, it has that effect in respect of the parties, as the effect that it has on bona fide third parties (those people who had no knowledge of the act itself or of the element that rendered it void, such as the case of Mr. Mauricio Gonzalez), marriage does have effects and to him, it is an event of gross breach of spousal duties on the part of his wife, [Ms. Gonzalez], as she was unable to marry him because she was married in Chile. The same happens if they had had children, those children would be considered children born inside a wedlock.

Mr. Godoy's affidavit is contradicted by Ms. Gonzalez's evidence. For example, the "Legal Report" from Ms. Mellado states:

> . . . by decreeing the nullification of a legal act, **it is regarded that it never lawfully came to life; i.e. it never existed**. This means that the marriage between the parties rendered null and void by court judgment never existed in legal terms and, therefore, **the parties are reputed as if always having the single status**, notwithstanding the date of declaration of such nullification.
>
> By restoring the status prior to the declaration of nullity of the aforementioned act the parties are regarded as though they were never married and thus **they were always single**.

(Emphasis added). Unlike Mr. Godoy's affidavit, Ms. Mellado's statements are corroborated by the undisputed translation of the Chilean court order and the undisputed translations of Chilean law. Specifically, the finding of the Chilean court was that the Chilean marriage was "null and void," i.e. it "never existed." This conclusion is in line with Section 1687 of Title XX of the Chilean Civil Code, which provides that "[n]ullity under a final court decision grants the parties the right to be restored to the same condition they should have had in the absence of the annulled act or contract, without prejudice to provisions on illegal purpose and consideration." COD. CIV. APP., *Nullity and Rescission*, Art. 1687.

Concerning Ms. Gonzalez's Chilean marriage, the trial court found:

2. [Ms. Gonzalez]'s first purported marriage in Chile was void *ab initio* because it failed to comply with the mandatory provisions of Chilean law. Civil Code Appendix, Law of Civil Marriage, Art. I.

\*\*\*

4. Since that marriage never came to life, [Ms. Gonzalez] was able and competent to marry [Mr. Gonzalez] in Florida, and that marriage is lawful and valid.

Similarly, in **Echols v. Echols**, No. M2014-01856-COA-R3-CV, 2015 WL 5719735 (Tenn. Ct. App. Sept. 29, 2015), the parties disputed the proper interpretation of German laws that were provided to the trial court. *Id.* at \*6. This Court explained that, because neither party presented expert witnesses on German law, "the best the [t]rial [c]ourt and this Court [could] do" was to apply a "plausible interpretation of German law to this specific fact pattern." *Id.* at \*6. In view of the fact that Mr. Gonzalez failed to timely provide the trial court with translations of what he argues are relevant portions of the Chilean statute, and because neither party presented expert witnesses on Chilean law,[4] the only evidence available to the trial court (and to this Court) are the plausible interpretations of Chilean law Ms. Gonzalez provided.[5] Based on the Chilean statutes in the record, we conclude that the trial court correctly found that Ms. Gonzalez's Chilean marriage failed to comply with the mandatory provisions of Chilean law. Specifically, her marriage was not solemnized by a Civil Officer in the district where she or Mr. Escala lived for the three months preceding the date of the marriage. Therefore, the Civil Officer was without jurisdiction to marry Ms. Gonzalez and Mr. Escala. *See* COD. CIV. APP., *Civil Registration Act*, Art. 35. Accordingly, the Chilean court correctly held that the marriage was null and void. *See* COD. CIV. APP., *Law of Civil Marriage*, Art. 1. Mr. Godoy's affidavit and Ms. Mellado's report both explain that when a marriage is decreed null and void, it is regarded as though the marriage never existed. From the record, we conclude that Mr. Gonzalez failed to meet his burden to prove that this marriage is void as bigamous. As such, the trial court correctly held that the parties' marriage is valid such that the trial court could grant the parties a divorce and decide all relevant issues

---

[4] Mr. Gonzalez did not tender Mr. Godoy as an expert witness nor did he present Mr. Godoy's affidavit as an exhibit at the final trial. Similarly, Ms. Gonzalez did not tender Ms. Mellado as an expert witness nor did she present Ms. Mellado's report as an exhibit at the final trial.

[5] Mr. Gonzalez also argues on appeal that the trial court erred because it applied Tennessee law instead of Chilean law when it found that Ms. Gonzalez's Chilean marriage was void *ab initio*. While the trial court referenced Tennessee law in its order, it is clear that the trial court relied on Chilean law when it made its determination that there was no marriage in Chile. Therefore, we decline to address this issue on appeal.

pertaining thereto.[6]

## VI. Enforcement of the MDA

Here, Mr. Gonzalez's sole basis for his argument that the MDA is unenforceable rests on his contention that the parties were never married, i.e., "the consideration for the [MDA] was a divorce," and there can be no divorce if there was no marriage. However, having concluded that the trial court correctly held that the parties' marriage was valid, Mr. Gonzalez's argument fails.

In Tennessee, MDAs are treated as contracts and are subject to the rules governing construction of contracts. *See **Barnes v. Barnes***, 193 S.W.3d 495, 498 (Tenn. 2006); ***Honeycutt v. Honeycutt***, 152 S.W.3d 556, 561 (Tenn. Ct. App. 2003).[7] In ***Pitt v. Tyree Organization Ltd.***, 90 S.W. 3d 244 (Tenn. Ct. App. 2002), this Court explained that

> [t]he cardinal rule in the construction of contracts is to ascertain the intent of the parties. ***Bradson Mercantile, Inc. v. Crabtree***, 1 S.W.3d 648, 652 (Tenn. Ct. App. 1999) (citing ***West v. Laminite Plastics Mfg. Co.***, 674 S.W.2d 310 (Tenn. Ct. App. 1984)). If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms. ***Id.*** (citing ***Petty v. Sloan***, 197 Tenn. 630, 277 S.W.2d 355 (Tenn. 1955)). The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. ***Id.*** (citing ***Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth***, Inc., 521 S.W.2d 578 (Tenn. 1975)). In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. ***Id.*** (citing ***Ballard v. North American Life & Cas. Co.***, 667 S.W.2d 79 (Tenn. Ct. App. 1983)). If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the

---

[6] Mr. Gonzalez's appellate argument that the parties' marriage is void under both Florida and Tennessee law due to bigamy is moot because we affirm the trial court's ruling that the Chilean marriage was void *ab initio*.

On appeal, Ms. Gonzalez argues that Mr. Gonzalez is estopped from challenging the validity of the parties' marriage because he "abandoned his theory of his case (being, his marriage is invalid) by executing the [MDA]." Ms. Gonzalez's estoppel argument is premised on this Court finding that the parties' marriage was invalid. Because we have concluded that the parties entered into a valid marriage, this issue is pretermitted.

[7] For completeness, we note that, although Mr. Gonzalez attempted to disavow the MDA after he signed it, the trial court correctly enforced the MDA as a contract. In ***Barnes***, the Tennessee Supreme Court explained that "a marital dissolution agreement may be enforceable as a contract even if one of the parties withdraws consent prior to the entry of judgment by the trial court, so long as the agreement is otherwise a validly enforceable contract." ***Barnes***, 193 S.W.3d at 499.

- 14 -

parties. *Id.* (citing ***Sutton v. First Nat. Bank of Crossville***, 620 S.W.2d 526 (Tenn. Ct. App. 1981)). Courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made. *Id.* (citing ***McKee v. Continental Ins. Co.***, [] 234 S.W.2d 830 (Tenn. 1950)).

*Id.* at 252.

The parties' MDA provides, in pertinent part, that

[t]he parties affirm Wife's need of rehabilitation so as to allow her to provide for herself without the support of Husband. In order to be rehabilitated, Wife needs to secure a four-year degree from a college or university, and Wife intends (and has already registered) to attend the University of Memphis and pursue a bachelor[']s degree. Wife anticipates completing the course work necessary to receive said bachelor[']s degree in four (4) years, and upon receipt of said bachelor[']s degree, Wife will be fully rehabilitated. Accordingly, Husband shall pay to Wife as rehabilitative alimony the sum of $961.00 per month for forty-eight (48) consecutive months commencing on August 1, 2017 and ending on July 31, 2021, for a total of $46,128.00. Such payment . . . shall be made on a weekly basis in the amount of $221.77 per week.

The foregoing language is clear and unambiguous. The trial court held that

[t]he terms of the [MDA] shall be controlling and the parties shall comply with the [MDA] in all respects except the commencement date for the rehabilitative alimony due to [Ms. Gonzalez] from [Mr. Gonzalez] shall be modified to September 1, 2018 and shall be paid at a rate of $961.00 per month due on the first of each month for a total of forty-eight (48) consecutive months.

The trial court's modifications concerning monthly payments of alimony as opposed to weekly payments, and the starting date for the alimony do not disturb the parties' intent as stated in the plain language of the MDA. The MDA clearly requires Mr. Gonzalez to pay alimony for 48 months, and we conclude that the trial court did not err in enforcing this obligation.

Mr. Gonzalez next argues that the trial court erred in awarding Ms. Gonzalez $7,000.00 in attorney's fees under the MDA. The Tennessee Supreme Court has explained that parties may contract for attorney's fees in a MDA, to-wit:

A [MDA] is a contract entered into by a husband and wife in contemplation of divorce. *See **Barnes***[, 193 S.W.3d at 498] (citing ***Johnson v. Johnson***, 37 S.W.3d 892, 896 (Tenn. 2001); ***Honeycutt***[, 152 S.W.3d at 561]). As a

- 15 -

contract, a MDA generally is subject to the rules governing construction of contracts. *Id.* . . . Thus, a MDA may include enforceable contractual provisions regarding an award of attorney's fees in post-divorce legal proceedings.

*Eberbach v. Eberbach*, 535 S.W.3d 467, 474-75 (Tenn. 2017). Concerning an award of attorney's fees, the parties' MDA provides:

16. **<u>Non-Compliance</u>**. Should either party incur any expense or legal fees as a result of the breach of any portion of this Marital Dissolution Agreement, whether contractual or otherwise, by the other party, the Court shall award reasonable attorney's fees and suit expenses to the non-defaulting party. No breach, waiver or default of any of the terms of this Agreement shall constitute a waiver of any subsequent breach or default of any of the terms of this Agreement.

Mr. Gonzalez alleges that "the plain language of the [MDA] only mandates an award of fees in the event a party defaults under the Agreement." He argues that the MDA does not mandate attorney's fees for *enforcement* of the MDA. ***Black's Law Dictionary*** defines "breach" as "[a] violation or infraction of a law, obligation, or agreement, especially of an official duty or a legal obligation, whether by neglect, refusal, resistance, or inaction." ***Black's Law Dictionary*** (11th ed. 2019). Ms. Gonzalez filed her enforcement action because Mr. Gonzalez violated their agreement, i.e. he breached the MDA. Specifically, his repudiation of the entire MDA and argument at the final trial that the trial court should not grant Ms. Gonzalez a divorce based on irreconcilable differences was a breach of the MDA. In the MDA, Mr. Gonzalez agreed that he "would admit [and agree] that [Ms. Gonzalez] should be awarded a divorce on the ground of [i]rreconcilable [d]ifferences. . . ." By signing the MDA, Mr. Gonzalez further agreed that the terms of the MDA would "becom[e] an [o]rder of [the trial court] by incorporation and reference into the Final Decree of Absolute Divorce." Mr. Gonzalez also breached the MDA when he failed to pay Ms. Gonzalez rehabilitative alimony, thereunder. At trial, Mr. Gonzalez admitted that he agreed to pay Ms. Gonzalez spousal support but that he had paid her "none" at the time of trial.

In its final order, the trial court found:

9. [Ms. Gonzalez] incurred attorney fees in her efforts to enforce the [MDA], and therefore, as a matter of law, consistent with the [MDA], [Mr. Gonzalez] shall pay to [Ms. Gonzalez]'s counsel . . . the sum of $7,000.00 to be paid in quarterly installments of $1,000.00 with the first payment due on October 1, 2018, and subsequent installments paid on January 1, 2019, April 1, 2019, July 1, 2019, October 1, 2019, January 1, 2020, and April 1, 2020.

- 16 -

Ms. Gonzalez's enforcement motion, as well as the expenses and legal fees incurred therefrom, were a "result of [Mr. Gonzalez's] breach" of the MDA. Therefore, the trial court correctly awarded her attorney's fees under the MDA. However, the trial court made no findings concerning how it arrived at the $7,000.00. Tenn. R. Civ. P. 52.01. From our review, there also is no evidence in the record from which we can derive the trial court's reasoning concerning the amount of the attorney's fee award. Therefore, although we affirm the trial court's award of attorney's fees under the MDA, we vacate the amount and remand for findings concerning the amount and reasonableness of the award.

Because Mr. Gonzalez appealed the trial court's final order concerning the validity of the parties' marriage, the enforcement of the MDA and all issues stemming from such enforcement, Ms. Gonzalez was forced to incur more costs and fees by litigating these issues on appeal. Accordingly, on remand, the trial court is also directed to: (1) determine the amount of reasonable and necessary attorney's fees Ms. Gonzalez incurred as a result of this appeal; and (2) enter a judgment in favor of Ms. Gonzalez for her reasonable appellate fees and expenses.

In view of our holdings, Mr. Gonzalez is not entitled to an award of attorney's fees under the MDA, or otherwise, and we deny his request for same.

## VII. Conclusion

For the foregoing reasons, we vacate the trial court's order concerning the amount of attorney's fees awarded to Ms. Gonzalez. The trial court's order is otherwise affirmed. The case is remanded for the trial court to make findings as to the amount and reasonableness of the attorney's fee award, for determination of Ms. Gonzalez's appellate attorney's fees and costs, for entry of judgment on same, and for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Mauricio Gonzalez, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE